**AMF, INCORPORATED,
Plaintiff-Appellant,**

**v.**

**McDONALD'S CORPORATION,
Defendant-Appellee.**

**No. 75–1744 consolidated with Nos.
75–1745 through 75–1751.**

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 20, 1976.

Decided June 22, 1976.

Jerald P. Esrick, Chicago, Ill., Sidney P. Howell, New York City, for plaintiff-appellant.

Frederic S. Lane, Chicago, Ill., for defendant-appellee.

Before CASTLE, Senior Circuit Judge, SWYGERT and CUMMINGS, Circuit Judges.

CUMMINGS, Circuit Judge.

AMF, Incorporated, filed this case in the Southern District of New York in April 1972. It was transferred to the Northern District of Illinois in May 1973. AMF seeks damages for the alleged wrongful cancellation and repudiation of McDonald's Corporation's ("McDonald's") orders for sixteen computerized cash registers for installation in restaurants owned by wholly-owned subsidiaries of McDonald's and for seven such registers ordered by licensees of McDonald's for their restaurants. In July 1972, McDonald's of Elk Grove, Inc. sued AMF to recover the $20,385.28 purchase price paid for a prototype computerized cash register and losses sustained as a result of failure of the equipment to function satisfactorily. Both cases were tried together during a fortnight in December 1974. A few months after the completion of the bench trial, the district court rendered a memorandum opinion and order in both cases in favor of each defendant. The only appeal is from the eight judgment orders dismissing AMF's complaints against McDonald's and the seven licensees.[1] We affirm.

The district court's memorandum opinion and order are unreported. Our statement of the pertinent facts is culled from the 124 findings of fact contained therein or from the record itself.

In 1966, AMF began to market individual components of a completely automated restaurant system, including its model 72C computerized cash register involved here. The 72C cash register then consisted of a central computer, one to four input stations, each with a keyboard and cathode ray tube display, plus the necessary cables and controls.

In 1967 McDonald's representatives visited AMF's plant in Springdale, Connecticut, to view a working "breadboard" model 72C to decide whether to use it in McDonald's restaurant system. Later that year, it was agreed that a 72C should be placed in a McDonald's restaurant for evaluation purposes.

In April 1968, a 72C unit accommodating six input stations was installed in McDonald's restaurant in Elk Grove, Illinois. This restaurant was a wholly-owned subsidiary of McDonald's and was its busiest restaurant. Besides functioning as a cash register, the 72C was intended to enable counter personnel to work faster and to assist in providing data for accounting reports and bookkeeping. McDonald's of Elk Grove, Inc. paid some $20,000 for this prototype register on January 3, 1969. AMF never gave McDonald's warranties governing reliability or performance standards for the prototype.

At a meeting in Chicago on August 29, 1968, McDonald's concluded to order sixteen 72C's for its company-owned restaurants and to cooperate with AMF to obtain additional orders from its licensees. In December 1968, AMF accepted McDonald's purchase orders for those sixteen 72C's. In late January 1969, AMF accepted seven additional orders for 72C's from McDonald's licensees for their restaurants.[2] Under the contract for the sale of all the units, there was a warranty for parts and service. AMF proposed to deliver the first unit in February 1969, with installation of the remaining twenty-two units in the first half of 1969. However, AMF established a new delivery schedule in February 1969, providing for deliveries to commence at the end of July 1969 and to be completed in January 1970, assuming that the first test unit being built at AMF's Vandalia, Ohio, plant was built and satisfactorily tested by the end of July 1969. This was never accomplished.

1. AMF's lawsuits against said licensees were governed by the parent case and were dismissed in the light of the district court's memorandum opinion and order entered in AMF's case against McDonald's.

2. An eighth order was cancelled and is not involved in this lawsuit.

During the operation of the prototype 72C at McDonald's Elk Grove restaurant, many problems resulted, requiring frequent service calls by AMF and others. Because of its poor performance, McDonald's had AMF remove the prototype unit from its Elk Grove restaurant in late April 1969.

At a March 18, 1969, meeting, McDonald's and AMF personnel met to discuss the performance of the Elk Grove prototype. AMF agreed to formulate a set of performance and reliability standards for the future 72C's, including "the number of failures permitted at various degrees of seriousness, total permitted downtime, maximum service hours and cost." Pending mutual agreement on such standards, McDonald's personnel asked that production of the twenty-three units be held up and AMF agreed.

On May 1, 1969, AMF met with McDonald's personnel to provide them with performance and reliability standards. However, the parties never agreed upon such standards. At that time, AMF did not have a working machine and could not produce one within a reasonable time because its Vandalia, Ohio, personnel were too inexperienced. After the May 1st meeting, AMF concluded that McDonald's had cancelled all 72C orders. The reasons for the cancellation were the poor performance of the prototype, the lack of assurances that a workable machine was available and the unsatisfactory conditions at AMF's Vandalia, Ohio, plant where the twenty-three 72C's were to be built.

On July 29, 1969, McDonald's and AMF representatives met in New York. At this meeting it was mutually understood that the 72C orders were cancelled and that none would be delivered.

In its conclusions of law, the district court held that McDonald's and its licensees had entered into contracts for twenty-three 72C cash registers but that AMF was not able to perform its obligations under the contracts (see note, 1, *supra*). Citing Section 2–610 of the Uniform Commercial Code (Ill.Rev.Stats. (1975) ch. 26, § 2–610) [3] and Comment 1 thereunder, [4] the court concluded that on July 29, McDonald's justifiably repudiated the contracts to purchase all twenty-three 72C's.

Relying on Section 2–609 and 2–610 of the Uniform Commercial Code (Ill.Rev. Stats. (1975) ch. 26, §§ 2–609 and 2–610), [5] the court decided that McDonald's was warranted in repudiating the contracts and therefore had a right to cancel the orders

---

**3.** Section 2–610 provides:

"*Anticipatory Repudiation.* When either party repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party may

"(a) for a commercially reasonable time await performance by the repudiating party; or

"(b) resort to any remedy for breach (Section 2–703 or Section 2–711), even though he has notified the repudiating party that he would await the latter's performance and has urged retraction; and

"(c) in either case suspend his own performance or proceed in accordance with the provisions of this Article on the seller's right to identify goods to the contract notwithstanding breach or to salvage unfinished goods (Section 2–704)."

**4.** Official Comment 1 is reproduced in Uniform Commercial Code Annotated 401 (1968) and need not be considered in the disposition of this case.

**5.** Section 2–609 provides:

*Right to Adequate Assurance of Performance.* (1) A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired. When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.

"(2) Between merchants the reasonableness of grounds for insecurity and the adequacy of any assurance offered shall be determined according to commercial standards.

"(3) Acceptance of any improper delivery or payment does not prejudice the aggrieved party's right to demand adequate assurance of future performance.

"(4) After receipt of a justified demand failure to provide within a reasonable time not exceeding 30 days such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract."

by virtue of Section 2–711 of the Uniform Commercial Code (Ill.Rev.Stats. (1975) ch. 26, § 2–711).[6] Accordingly, judgment was entered for McDonald's.

The findings of fact adopted by the district court were a mixture of the court's own findings and findings proposed by the parties, some of them modified by the court. AMF has assailed ten of the 124 findings of fact, but our examination of the record satisfies us that all have adequate support in the record and support the conclusions of law.

■ Whether in a specific case a buyer has reasonable grounds for insecurity is a question of fact. Comment 3 to UCC § 2–609; Anderson, Uniform Commercial Code, § 2–609 (2d Ed. 1971). On this record, McDonald's clearly had "reasonable grounds for insecurity" with respect to AMF's performance. At the time of the March 18, 1969, meeting, the prototype unit had performed unsatisfactorily ever since its April 1968 installation. Although AMF had projected delivery of all twenty-three units by the first half of 1969, AMF later sched-

uled delivery from the end of July 1969 until January 1970. When McDonald's personnel visited AMF's Vandalia, Ohio, plant on March 4, 1969, they saw that none of the 72C systems was being assembled and learned that a pilot unit would not be ready until the end of July of that year. They were informed that the engineer assigned to the project was not to commence work until March 17th. AMF's own personnel were also troubled about the design of the 72C, causing them to attempt to reduce McDonald's order to five units. Therefore, under Section 2–609 McDonald's was entitled to demand adequate assurance of performance by AMF.[7]

■ However, AMF urges that Section 2–609 of the UCC (note 5 *supra*) is inapplicable because McDonald's did not make a written demand of adequate assurance of due performance. In *Pittsburgh-Des Moines Steel Co. v. Brookhaven Manor Water Co.*, 532 F.2d 572, 581 (7th Cir. 1976), we noted that the Code should be liberally construed[8] and therefore rejected such "a

6. Section 2–711 provides:
   "*Buyer's Remedies in General; Buyer's Security Interest in Rejected Goods.* (1) Where the seller fails to make delivery or repudiates or the buyer rightfully rejects or justifiably revokes acceptance then with respect to any goods involved, and with respect to the whole if the breach goes to the whole contract (Section 2–612), the buyer may cancel and whether or not he has done so may in addition to recovering so much of the price as has been paid
   "(a) 'cover' and have damages under the next section as to all the goods affected whether or not they have been identified to the contract; or
   "(b) recover damages for non-delivery as provided in this Article (Section 2–713).
   "(2) Where the seller fails to deliver or repudiates the buyer may also
   "(a) if the goods have been identified recover them as provided in this Article (Section 2–502); or
   "(b) in a proper case obtain specific performance or replevy the goods as provided in this Article (Section 2–716).
   "(3) On rightful rejection or justifiable revocation of acceptance a buyer has a security interest in goods in his possession or control for any payments made on their price and any expenses reasonably incurred in their inspection, receipt, transportation, care and

custody and may hold such goods and resell them in like manner as an aggrieved seller (Section 2–706)."

7. McDonald's was justified in seeking assurances about performance standards at the March 18th meeting. The parts and service warranty in the contracts for the twenty-three 72C's was essentially a limitation of remedy provision. Under UCC § 2–719(2) (Ill.Rev. Stats. (1975) ch. 26, § 2–719(2)) if the 72C cash registers failed to work or could not be repaired within a reasonable time, the limitation of remedy provision would be invalid, and McDonald's would be entitled to pursue all other remedies provided in Article 2. See *Riley v. Ford Motor Co.*, 442 F.2d 670, 673 (5th Cir. 1971); *Earl M. Jorgensen Co. v. Mark Construction Co.*, 540 P.2d 978, 985–987 (Hawaii 1975). Because McDonald's would have a right to reject the machines if they proved faulty after delivery and then to cancel the contract, it was consistent with the purposes of Section 2–609 for McDonald's to require assurances that such eventuality would not occur. See Comment 1 to UCC § 2–719.

8. UCC Section 1–102(1) provides that the Code "shall be liberally construed and applied to promote its underlying purposes and policies" (Ill.Rev.Stats. (1975) ch. 26, § 1–102(1)).

formalistic approach" to Section 2–609.[9] McDonald's failure to make a written demand was excusable because AMF's Mr. Dubosque's testimony and his April 2 and 18, 1969, memoranda about the March 18th meeting showed AMF's clear understanding that McDonald's had suspended performance until it should receive adequate assurance of due performance from AMF (Tr. 395; AMF Exhibit 79; McD. Exhibit 232).

After the March 18th demand, AMF never repaired the Elk Grove unit satisfactorily nor replaced it. Similarly, it was unable to satisfy McDonald's that the twenty-three machines on order would work. At the May 1st meeting, AMF offered unsatisfactory assurances for only five units instead of twenty-three. The performance standards AMF tendered to McDonald's were unacceptable because they would have permitted the 72C's not to function properly for 90 hours per year, permitting as much as one failure in every fifteen days in a busy McDonald's restaurant. Also, as the district court found, AMF's Vandalia, Ohio, personnel were too inexperienced to produce a proper machine. Since AMF did not provide adequate assurance of performance after McDonald's March 18th demand, UCC Section 2–609(1) permitted McDonald's to suspend performance. When AMF did not furnish adequate assurance of due performance at the May 1st meeting, it thereby repudiated the contract under Section 2–609(4). At that point, Section 2–610(b) (note 3 *supra*) permitted McDonald's to cancel the orders pursuant to Section 2–711 (note 6, *supra*), as it finally did on July 29, 1969.

In seeking reversal, AMF relies on *Pittsburgh-Des Moines Steel Co. v. Brookhaven Manor Water Co., supra*, 532 F.2d at 581. There we held a party to a contract could not resort to UCC Section 2–609 since there was no demonstration that reasonable grounds for insecurity were present. That case is inapt where, as here, McDonald's submitted sufficient proof in that respect. But that case does teach that McDonald's could cancel the orders under Sections 2–610 and 2–711 because of AMF's failure to give adequate assurance of due performance under Section 2–609.

AMF also relies heavily on *Stewart-Decatur Security Systems v. Von Weise Gear Co.*, 517 F.2d 1136 (8th Cir. 1975), but it did not involve the provisions of the Commercial Code that are before us. There the buyer had agreed to purchase production line models of a previously approved prototype. Here McDonald's contracted to purchase workable 72C's, not copies of the worthless Elk Grove prototype.

Judgment Affirmed.

---

**9.** See also *Copylease Corp. of America v. Memorex Corp.*, 403 F.Supp. 625, 631 (S.D.N.Y. 1975); *Kunian v. Development Corp. of America*, 334 A.2d 427, 433 (Conn.S.Ct.1973). A passing reference was made to UCC Section 609's written requirement for a demand in *National Ropes, Inc. v. National Diving Service, Inc.*, 513 F.2d 53, 61 (5th Cir. 1975). However, the court held that Section 2–609 was not applicable because there was no finding that the seller had reasonable grounds for insecurity and because the record would not support such a finding.