In the

# United States Court of Appeals

## For the Seventh Circuit

No. 20-1011

BRC RUBBER & PLASTICS, INC.,

*Plaintiff-Appellee,*

*v.*

CONTINENTAL CARBON COMPANY,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Indiana, Fort Wayne Division.
No. 1:11-cv-00190-SLC — **Susan L. Collins**, *Magistrate Judge*.

ARGUED OCTOBER 2, 2020 — DECIDED NOVEMBER 25, 2020

Before RIPPLE, KANNE, AND HAMILTON, *Circuit Judges*.

HAMILTON, *Circuit Judge*. This appeal presents two classic contract issues under Article 2 of the Uniform Commercial Code: (1) whether a seller of goods repudiated a supply contract by failing to give adequate assurance of its performance under § 2-609, and (2) whether the buyer acted reasonably in "covering" to replace the breaching seller's goods under § 2-712. The product was carbon black, used to manufacture rubber products. After a bench trial, the district court ordered

seller Continental Carbon Company to pay damages to buyer BRC Rubber & Plastics, Inc. The court resolved sharply disputed factual issues, finding that Continental had repudiated the parties' supply contract and that BRC acted reasonably in buying carbon black from different suppliers for the remaining years of the contract. The court also awarded prejudgment interest to BRC for the cost of the "cover," i.e., replacing the lost supply at higher prices. *BRC Rubber & Plastics, Inc. v. Continental Carbon Co.*, 2019 WL 3985900 (N.D. Ind. Aug. 22, 2019).

In this third, and we hope final, appeal in this case, we affirm. The district court's factual findings are not clearly erroneous. The court properly applied U.C.C. § 2-609 to find that the seller gave the buyer reasonable grounds for doubting that it would perform and that the seller then repudiated by failing to provide adequate assurance that it would continue to perform. The court then properly applied U.C.C. § 2-712 to find that the buyer's cover was commercially reasonable. Finally, the court did not err in awarding prejudgment interest.

I.  *Standards for Appellate Review*

We review the trial court's conclusions of law de novo, but we review its findings of fact and applications of law to findings of fact only for clear error. See *Metavante Corp. v. Emigrant Savings Bank*, 619 F.3d 748, 758–59 (7th Cir. 2010). "A finding of fact is clearly erroneous only when the reviewing court is left with the definite and firm conviction that a mistake has been committed." *Gaffney v. Riverboat Services of Indiana, Inc.*, 451 F.3d 424, 447 (7th Cir. 2006), quoting *Carnes Co. v. Stone Creek Mechanical, Inc.*, 412 F.3d 845, 847 (7th Cir. 2005). The appellate court "must affirm if the district court's account of the evidence is plausible" when viewed in light of the entire

record. *Advertising Specialty Inst. v. Hall-Erickson, Inc.*, 601 F.3d 683, 688 (7th Cir. 2010).

Appellate courts owe deference to a trial court's determination of the credibility of witnesses. *Anderson v. City of Bessemer*, 470 U.S. 564, 575 (1985) ("[W]hen a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses…that finding, if not internally inconsistent, can virtually never be clear error."). Continental urges us to give less deference to factual findings here because of the extent of documentary evidence in this case. In *Anderson*, however, the Supreme Court rejected just this argument. *Id.* ("This is so even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts.").

II. *Repudiation of a Sales Contract under U.C.C. § 2-609*

A. *Section 2-609*

BRC's claims arise under Indiana law, and the district court had jurisdiction under 28 U.S.C. § 1332. Indiana has adopted the Uniform Commercial Code. Section 2-609 on adequate assurance appears in Indiana Code § 26-1-2-609.[1]

---

[1] Indiana Code § 26-1-2-609 provides in full:

> (1) A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired. When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.

Under § 2-609, a party who has reasonable grounds for insecurity about the other's performance may request "adequate assurance" that the other will perform. The worried party may treat the other's failure to provide timely and adequate assurance as a repudiation of the contract. Whether the grounds for insecurity are reasonable and whether assurances are reasonable are matters of fact to be determined under all the circumstances. See *AMF, Inc. v. McDonald's Corp.*, 536 F.2d 1167, 1170 (7th Cir. 1976); U.C.C. § 2-609, cmt. 3; 4 Anderson U.C.C. § 2-609:16 (3d ed. 2019).

Critical to the district court's and our resolution of this case, § 2-609(2) provides: "Between merchants the reasonableness of grounds for insecurity and the adequacy of any assurance offered shall be determined according to commercial standards." See also *Wildwood Industries, Inc. v. Genuine Machine Design, Inc.*, 587 F. Supp. 2d 1035, 1047 (N.D. Ind. 2008) (Indiana law does not "suggest what form adequate assurance should take other than that the form be commercially

---

(2) Between merchants the reasonableness of grounds for insecurity and the adequacy of any assurance offered shall be determined according to commercial standards.

(3) Acceptance of any improper delivery or payment does not prejudice the aggrieved party's right to demand adequate assurance of future performance.

(4) After receipt of a justified demand failure to provide within a reasonable time not exceeding thirty days such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract.

reasonable."). The failure to give adequate assurance may be treated as a repudiation. U.C.C. § 2-609(4).

Section 2-609 addresses the problem that arises when one party to a contract has reasonable concerns about another party's ability or intent to fulfill its promises before performance is actually due. As comment 1 explains: "The section rests on the recognition of the fact that the essential purpose of a contract between commercial men [sic] is actual performance and they do not bargain merely for a promise, or for a promise plus the right to win a lawsuit and that a continuing sense of reliance and security that the promised performance will be forthcoming when due, is an important feature of the bargain." U.C.C. § 2-609, cmt. 1.

Section 2-609 was a significant and pragmatic innovation in the U.C.C. Professor Karl Llewellyn and other legal realists were pushing against more formalist legal rules for anticipatory repudiation that acknowledged a breach only after it had actually occurred, even if the breach had appeared inevitable or probable long before the date performance was due. See, e.g., *Lowe v. Harwood*, 29 N.E. 538, 539 (Mass. 1885) (Holmes, J.) (despite doubts about plaintiff's ability to pay money owed under contract, the "degree of [plaintiff's] ability at any moment before he was called on to pay was no concern of the defendant's"). Section 2-609 was intended to protect the "essential purpose of the bargain…performance itself." Larry T. Garvin, *Adequate Assurance of Performance: Of Risk, Duress, and Cognition*, 69 U. Colo. L. Rev. 71, 93 (1988) (discussing Llewellyn's comments urging codification of adequate assurance).[2]

---

[2] Professor Garvin's article provides a detailed account of the origins and evolution of what became § 2-609. The first Restatement of Contracts opened the pragmatic door a crack, teaching that an expression of doubt,

Indeed, "the point of a forward contract is the continued sense of reliance and security it gives the promisee. Loss of security thus deprives the promisee of much of the benefit of its bargain. … [An insecure buyer] cannot be certain that it will have the supplied goods for its own manufacturing or inventory." *Id*. (quotations and citations omitted).

The district court's factual findings trace here the kind of story for which § 2-609 was designed: a seller of goods tried to take advantage of a tight market to force a price increase on the buyer despite their long-term contract. When the buyer resisted the price increase, the seller threatened to stop supplying the buyer at all. The buyer then asked for "adequate assurance" under § 2-609, did not receive it, and so chose to treat the contract as repudiated.

B. *The Parties and Their Contract*

Plaintiff BRC Rubber & Plastics, Inc. designs and manufactures rubber and plastic products, primarily for the automotive industry. Defendant Continental Carbon Company manufactures carbon black, an ingredient in many rubber products.

---

"ordinarily inadequate to repudiate, would constitute breach if the promisee, relying on the doubt, arranged for cover." 69 U. Colo. L. Rev. at 88, citing Restatement of Contracts § 323, cmt. B, Illus. 1 (1932). In the 1941 draft of the Revised Uniform Sales Act, Llewellyn included a section governing instalment contracts that "allowed the aggrieved party to demand assurance that the other party's material default would no longer occur" and, if assurance was not "prompt," permitted the aggrieved party to "cancel the balance of the contract and seek its remedy for breach of the whole." *Id*. at 90. Eventually, the cross-reference instalment contracts was removed, and an early version of § 2-609 was born.

Before 2010, BRC bought all the carbon black it needed from Continental but without having a long-term supply contract. In 2009, BRC solicited bids from several suppliers of carbon black, seeking a long-term contract to ensure continuity of supply. Carbon black is a critical component in BRC's products. Because each supplier's products perform a little differently, BRC sought a single supplier of carbon black to help make its products' qualities as consistent as possible.

In late 2009, BRC and Continental signed a five-year contract to run from January 1, 2010 to December 31, 2014. Continental agreed to supply BRC with "approximately 1.8 million pounds of prime furnace black annually" taken in "approximately equal monthly quantities." The price of carbon black consists of a baseline price and so-called "feedstock" adjustments for the fluctuating prices of oil and natural gas.

The contract listed baseline prices for three types of carbon black, grades N339, N550, and N762, which were "to remain firm throughout the term of this agreement." The contract also included instructions for calculating the feedstock adjustments each month. The parties' dispute here focuses on the baseline prices in their contract.

In 2010, the first year under the contract, BRC bought 2.6 million pounds of carbon black from Continental. In the first four months of 2011, BRC bought about 1.3 million pounds, putting it on pace to buy about 3.9 million pounds that year.

C.  *BRC's Grounds for Insecurity*

In April 2011, supplies of carbon black were tight. Continental tried to use market shortages to impose an increase in the baseline prices for to BRC. Continental agrees for purposes of appeal that its actions gave BRC reasonable grounds

for insecurity under § 2-609. The dispute is whether Continental provided adequate assurance in response to BRC's demand. We summarize the district court's detailed findings of fact about how the problem arose, which is relevant to the adequacy of the assurance that Continental later provided.

Thomas Moccia was at the center of the effort. He was Continental's vice president of marketing and development. He instructed Thomas Nunley, its sales representative on the BRC account, to raise prices for BRC. Nunley protested the change. He thought it violated the contract with BRC. Moccia told him to proceed anyway because BRC could not obtain carbon black elsewhere.

On those instructions, on April 14, 2011, Nunley emailed Michael Cornwell, vice president of materials at BRC, to announce a unilateral price increase of two cents per pound effective June 1. Cornwell replied the next day that the price increase would violate the parties' five-year contract. Continental refused to rescind the price increase, and Moccia instructed Nunley to withhold shipping from BRC unless it agreed to the increase.[3]

---

[3] Continental argues that the district court clearly erred in this finding. Nunley testified on direct that Moccia instructed him to withhold shipping to BRC unless it agreed to the price increase: "Q: And did he tell you why you couldn't ship carbon black to BRC? A. Because they weren't going to accept our 2-cent-a-pound increase." Tr. 196–97. On cross-examination, Nunley was impeached with his deposition testimony: "Q: Do you recall any discussions after that April 26 purchase order about whether or not Continental would supply BRC? A: To my knowledge, I did not have any discussions about whether they were going to supply or not." Tr. 224. Neither counsel asked Nunley to explain the apparent contradiction. The deposition of another former Continental sales representative corroborated Nunley's direct testimony. The other representative testified that

Between April 15 and 27, 2011, BRC placed new orders with Continental relying on the contract's prices. It did not receive any communications from Continental regarding the price increase. On April 27, Cornwell repeated BRC's objection and said that BRC expected Continental to abide by the contract prices. Again, Continental did not respond. Moccia had instructed Nunley not to respond to BRC's April 27 letter. On April 29, Nunley called BRC's Cornwell and said that his superiors had told him he was no longer allowed to communicate with BRC. BRC leadership was worried because if Continental refused to ship to BRC, it would disrupt BRC's ability to fulfill its customer's demands, which would have been "devastating" for BRC's business.

On May 9, 2011, Continental fired Nunley, and Nunley told Cornwell the next day. Cornwell then emailed Moccia directly to say again that BRC expected Continental to abide by the terms of the contract. He asked for a written response to his April 27 letter by May 20. Moccia had Continental's sales manager David Word call Cornwell on May 10. Word knew little about BRC and offered meager satisfaction, saying that pricing was out of his control.

On May 11, 2011, Continental missed a shipment to BRC under an April 12 purchase order. And on May 13, Word again told BRC that Continental could not guarantee to ship product under the April 26 purchase order and that it was

---

Moccia instructed sales representatives not to place an order if the customer would not accept the price increase. Dkt. 247, JE384–86. It is not unusual for a witness to give conflicting accounts within the scope of his testimony and for judges and juries to decide which version to credit. The district court found that Moccia did instruct Nunley not to ship to BRC unless it agreed to the price increase. The finding is not clearly erroneous.

"out of his control." Word also would not confirm any future shipment dates or tell BRC when to expect a response from Continental to confirm that it intended to perform under the contract. In a May 13 email, BRC's Cornwell told Word that this was "totally unacceptable," that the delay in shipping jeopardized BRC's ability to satisfy its customers, and that "BRC will not allow this to occur."

On May 13, to avoid running out of N762 carbon black, BRC began looking for alternate suppliers. One was able to promise grade N762 carbon black for a shipment in 30 days at a spot rate higher than the price in the BRC-Continental contract.

D. *BRC's Request for Assurance and the Conflicting Responses*

On May 16, 2011, BRC formally invoked § 2-609. BRC's outside lawyer emailed a letter to Continental's Moccia asking for adequate assurance that Continental would continue to supply carbon black under the existing contract. The letter asked Continental to respond by May 18 and identified two main issues with Continental's performance: (1) Continental had not shipped carbon black grade N762 under the April 26 purchase order; and (2) Continental's request for a price increase was unacceptable. Continental concedes for purposes of appeal that this series of events gave BRC grounds for reasonable insecurity within the meaning of § 2-609 so that BRC was entitled to demand prompt and adequate assurance from Continental. The contested issue is whether Continental actually provided adequate assurance.

The district court traced in detail Continental's contradictory responses over the next two weeks. *BRC Rubber & Plastics*, 2019 WL 3985900, at *1–7. After looking at the course of

communications, the district court found that Continental had failed to provide adequate assurance. Just one communication, on May 20, from Continental's outside lawyer to BRC's lawyer, purported to provide adequate assurance. But that assurance was contradicted and undermined by Continental's other actions and statements during the two weeks following BRC's request for assurance. Continental hedged on whether it would actually fill BRC's orders (as opposed to "trying" to do so). Most significant, Continental continued to demand that BRC accept the price increase that Continental's lawyer had supposedly forsworn.

On May 20, 2011, Continental's lawyer responded to BRC's § 2-609 demand and confirmed that Continental would comply with the contract. If that communication could be considered in isolation, we assume it might have been sufficient as "adequate assurance." But on that same day, Continental's Linda Nelson wrote to BRC that Continental could fulfill the April 26 purchase order with modified shipping dates, *but with the disputed price increase*. When BRC objected again to the price increase, Continental's Moccia replied that BRC should look for another supplier. And still later that day, when BRC asked Moccia to confirm what Continental's lawyer had said, Moccia hedged. The hedging continued for another week, from Moccia and others at Continental. The last straw came on May 28 when Continental sent BRC its June prices. The list included the disputed price increase.

After a party has made a proper demand for adequate assurance, § 2-609(4) requires "assurance of due performance as is adequate under the circumstances of the particular case." The text of § 2-609 leaves the trier of fact considerable leeway in deciding whether assurances of performance are adequate.

Comment 4 to § 2-609 instructs: "What constitutes 'adequate' assurance of due performance is subject to the same test of factual conditions," telling the trier of fact to consider commercial practicalities in light of all the circumstances. For example, a promise by a seller in good repute that a defect in delivery will not be repeated is "normally sufficient," but the same promise made by a "known corner-cutter might well be considered insufficient…." *Id.* And "repeated delinquencies must be viewed as cumulative." *Id.* A failure to provide adequate assurance under the circumstances "is a repudiation of the contract." U.C.C. § 2-609(4).

Applying the standard of commercial reasonableness to all the circumstances of the case, the district court reasonably found that Continental's assurance was inadequate. Continental did not follow its lawyer's assurance with consistent expressions of its readiness to perform under the contract. It did the opposite. Its repeated equivocations and contradictions undermined the lawyer's assurance. In particular, Continental's repeated use of its unauthorized baseline price increase—after its lawyer supposedly assured BRC it would abide by the contract—was a "clear indication" that it did not intend to continue performing under the existing contract. The situation is similar to a case where the seller repudiated the contract by failing to provide adequate assurance and instead asking the buyer to review a new, more onerous sales agreement. *Gatt Trading, Inc. v. Sears, Roebuck and Co.*, 2004 WL 2511894, at *14 (N.D. Tex. Nov. 8, 2004); see also *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 568–69 (10th Cir. 1989) (buyer failed to provide adequate assurance where buyer tried to force price cut); *Louisiana Power & Light Co. v. Allegheny Ludlum Indus., Inc.*, 517 F. Supp. 1319, 1322–23 (E.D.

La. 1981) (seller's "qualified offer" to "perform…for added compensation" was not adequate assurance under § 2-609).

Continental's failure to provide adequate assurance meant that BRC was entitled to treat Continental as having repudiated the contract. *AMF, Inc. v. McDonald's Corp.*, 536 F.2d 1167, 1171 (7th Cir. 1976), citing *Pittsburgh-Des Moines Steel Co. v. Brookhaven Manor Water Co.*, 532 F.2d 572, 581 (7th Cir. 1976). That's what BRC did on June 2, 2011, notifying Continental that it was terminating the parties' contract and had filed this lawsuit. BRC then proceeded to "cover" by starting to buy carbon black from another supplier at higher prices, which it did for the rest of the contract term.

E. *Continental's Arguments Against Repudiation*

To avoid the finding that it repudiated the contract, Continental offers several arguments: that its lawyer's assurance was adequate assurance by itself; that the price dispute was not substantial and was only a pretext for BRC's actions; that the price increase would not have substantially impaired the contract as a whole; and that BRC should have been required to prove "clear, absolute, and unconditional" repudiation under U.C.C. § 2-610. We explain next why we reject these arguments.

1. *Continental's May 20 Assurance*

First, Continental says that its lawyer's assurance of May 20 was adequate. If its contemporaneous and later communications contradicted that assurance, Continental argues, BRC should have sent a fresh statement of reasonable insecurity and started the § 2-609 sequence all over again.

Continental offers no authority requiring that one selected communication be considered in such isolation, and we see

no reason to do so. In evaluating both grounds for insecurity and adequacy of assurances under § 2-609, the U.C.C. adopts a standard of commercial reasonableness. Applying that standard, a buyer in BRC's position could not reasonably be required to take the lawyer's assurance at face value when the client was contradicting that assurance at every turn.

Recall that § 2-609 focuses on the reality that merchants expect one another to perform under their contracts. Here, BRC needed carbon black to manufacture products for its customers and stay in business. The district court's approach is consistent with comment 4 to § 2-609, which instructs that "repeated delinquencies must be viewed as cumulative." Continental's actions and statements after its lawyer's assurance of May 20 were repeated delinquencies that must be viewed as cumulative. We see no reason to impose on the eminently practical standards and process of § 2-609 the formalistic dance that Continental proposes, such that if a supposedly adequate assurance is given but then immediately undermined, the insecure party would need to start the § 2-609 process all over again.

### 2. *"Peanuts" and Substantial Impairment*

Second, Continental argues that BRC was not, as the district court found, actually the victim of an unjust price increase. Continental points to evidence that BRC terminated the contract not because of the modest price increase but because it thought, incorrectly, that its contract required Continental to supply all of BRC's requirements for carbon black. We rejected that reading of the contract by BRC in the first appeal in this case. *BRC Rubber & Plastics, Inc. v. Continental Carbon Co.*, 804 F.3d 1229 (7th Cir. 2015). Continental cites, for example, testimony from BRC's CEO calling the two-cent per

pound price increase "peanuts." As Continental sees the case, BRC abandoned its original theory for repudiation (the mistaken belief that it had a requirements contract), and then embraced a pretext for repudiation (the "peanuts" price increase).

Continental offers a reasonable view of the conflicting evidence. The problem is that BRC's and the district court's view of the evidence is also reasonable. That factual dispute is one of the reasons we remanded for trial in the second appeal. *BRC Rubber & Plastics, Inc. v. Continental Carbon Co.*, 900 F.3d 529, 537–43 (7th Cir. 2018). We find nothing clearly erroneous in the district court's central finding that Continental repudiated the terms of the parties' contract by failing to give adequate assurance in response to a reasonable demand under § 2-609. Even after Continental's lawyer gave the supposed assurance that it would honor the contract, Continental continued to insist on its price increase.

Precedents under § 2-609 teach that continuing to push for a price increase or a contract modification after a demand for adequate assurance amounts to a failure to provide adequate assurance. See *Kaiser-Francis Oil Co.*, 870 F.2d at 568–69 (affirming summary judgment for seller where buyer tried to force price cut; buyer failed to provide adequate assurance where evidence showed that it "had no intention of performing the contract unless [seller] agreed to modify the take-or-pay provision"); *Louisiana Power & Light Co.*, 517 F. Supp. at 1322–23 (granting summary judgment for buyer; seller made "qualified offer" to "perform…for added compensation," which was not adequate assurance under § 2-609); *Copylease Corp. v. Memorex Corp.*, 403 F. Supp. 625, 631 (S.D.N.Y. 1975)

(granting summary judgment on breach for buyer; manufacturer failed to retract its intention to modify contract unilaterally and thus failed to give reasonable assurance of performance); see also 1 White, Summers, & Hillman, U.C.C. § 7:6 (6th ed. 2020) (assurance that hedges by, for example, promising performance only if the contracts "are determined to be enforceable" is not adequate assurance under § 2-609), citing *Land O'Lakes, Inc. v. Hanig*, 610 N.W.2d 518, 523–24 (Iowa 2000) (finding that seller's assurances were unreasonable as a matter of law).

In a similar vein, Continental argues that its "over-performance" under the contract, delivering 1.3 million pounds in the first four months of 2011, undermines any argument that it failed to provide adequate assurance. Continental's performance in the first four months of 2011 reduced the balance of the amount it was obliged to supply for the remainder of 2011. Those quantities did not substitute for Continental's failure to provide reasonable assurance of its remaining contractual obligations. A party's satisfaction of a past obligation prior to the events prompting a reasonable request for adequate assurance may be relevant but does not substitute for adequate assurance of future performance. See U.C.C. § 2-609, cmt. 2 (section merges principles of anticipatory breach, defective part performance, and repudiation "into a single theory of general application to all sales agreements looking to *future* performance") (emphasis added).

### 3. *Effect on the Whole Contract?*

Continental also argues that even if its price increase amounted to a breach, it did not substantially impair the value of the whole contract so that BRC was not entitled to treat the whole contract as repudiated. After a seller repudiates under

§ 2-609(4) by failing to give adequate assurances, § 2-711(1) provides that the buyer may cancel and seek damages under § 2-712 "if the breach goes to the whole contract." U.C.C. § 2-711(1); Ind. Code § 26-1-2-711(1) ("Where the seller…repudiates…with respect to the whole if the breach goes to the whole contract (IC 26-1-2-612), the buyer may cancel…."); see also 4 Anderson U.C.C. § 2-609:75 (3d ed. 2019) ("The failure to provide adequate assurance when properly demanded is a breach of the contract that entitles the aggrieved party to assert any remedy authorized by the Code in case of breach.").[4]

Determining whether the "breach goes to the whole contract" involves an analysis under § 2-612, and under § 2-612(3), a breach of the whole occurs "whenever non-conformity or default with respect to one or more instalments substantially impairs the value of the whole contract." Under § 2-612, a party may demonstrate substantial impairment from one or more nonconforming instalment(s) through "evidence that with respect to its own needs, the value of the goods was substantially impaired by the breach." *Integrity Bio-Fuels, LLC v. Musket Corp.*, 2015 WL 1417849, at *33 (S.D. Ind. Mar. 27, 2015), citing *Arkla Energy Resources v. Roye Realty & Dev., Inc.*,

---

[4] Repudiation under § 2-609 can justify either cancellation under § 2-711 or rejection by the non-breaching party. See *ARB (American Research Bureau), Inc. v. E-Systems, Inc.*, 663 F.2d 189, 196 (D.C. Cir. 1980) (affirming as to adoption of special master's report; buyer was entitled to reject nonconforming product due to seller's failure to provide adequate assurance under § 2-609); *Hudson Feather & Down Products, Inc. v. Lancer Clothing Corp.*, 128 A.D.2d 674, 674 (N.Y. App. 1987) (affirming judgment for buyer; seller's failure to provide adequate assurance meant buyer was "entitled to cancel the contract"); *Turntables, Inc. v. Gestetner*, 52 A.D.2d 776, 776 (N.Y. App. 1976) (affirming judgment for seller; buyer's refusal to give any assurances whatsoever meant seller was entitled to cancel contract).

9 F.3d 855, 862 (10th Cir. 1993); *Midwest Mobile Diagnostic Imaging, LLC v. Dynamics Corp. of America*, 965 F. Supp. 1003, 1012 (W.D. Mich. 1997). But some authorities indicate that repudiation through failure to provide adequate assurance is by default automatically an impairment to the "entire contract," permitting the buyer to cancel under § 2-711. See 4 Anderson U.C.C. § 2-609:76 (3d ed. 2019) ("When the seller repudiates the contract and refuses to give the buyer assurance of future performance, the value of the entire contract to the buyer is impaired and the buyer may cancel the contract."); *Hudson Feather & Down Products*, 128 A.D.2d at 674 ("The seller's refusal to respond to the buyer's demands for further assurances was a substantial impairment of the whole contract…and the buyer was therefore entitled to cancel the contract…."). See also note 4, supra.

The district court concluded here that Continental's repudiation did substantially impair the value of the contract. That was an application of law to findings of fact that we review for clear error. *Trustees of the Chicago Painters & Decorators Pension v. Royal Int'l Drywall & Decorating, Inc.*, 493 F.3d 782, 785 (7th Cir. 2007). Continental argues, though, that its two-cent-per-pound price increase was too small to affect the overall value of the contract and that the contract was an instalment contract and could not be cancelled because of one non-conforming instalment. We reject both challenges.

The district court found that the price increase "would affect the remaining shipments due in 2011 and every shipment from 2012 until 2014, causing a substantial negative financial impact to BRC." *BRC Rubber & Plastics*, 2019 WL 3985900, at *14. BRC reasonably believed both that Continental's unilateral price increase would affect all future shipments of carbon

black for years to come, and that Continental would withhold future shipments if BRC did not pay the price increase. In other words, Continental had shown BRC that it was not a trustworthy business partner and supplier for a commodity essential for BRC's business. Continental's actions qualify as the sort of repudiation contemplated by the Anderson treatise: repudiation that impairs the value of the entire contract. See 4 Anderson U.C.C. § 2-609:76 (3d ed. 2019). Thus, whether or not the contract was an instalment contract under § 2-612, the district court reasonably found that Continental's demand for a price increase substantially impaired the value of the contract as a whole.

Continental's final point on the "whole contract" issue is that BRC should not recover damages because the 1.8 million pounds per year in the contract were not sufficient for BRC's needs. Continental argues from this foundation that BRC's need or preference for having just one supplier of carbon black meant that BRC would have had to find a new supplier in any event. That is not an unreasonable argument, but it presents an issue of commercial reasonableness that was decided against Continental at trial. We find no clear error in the district court's finding that BRC reasonably chose to insist on 1.8 million pounds per year from Continental with the agreed pricing and to manage for itself any complications caused by needing to buy more carbon black from other sources. Even though BRC required more than 1.8 million pounds a year, it is still entitled to damages for Continental's failure to supply 1.8 million pounds a year under the contract.

4. *Anticipatory Repudiation Under § 2-610*

Fourth, in what might be described as an attempt to turn lemons into lemonade, Continental relies on the very ambiguity of its actions and communications to argue that it did not repudiate the contract. This argument relies not on § 2-609 but on § 2-610, which addresses anticipatory repudiation and imposes a different and more demanding standard. Indiana courts have said that anticipatory repudiation under § 2-610 must be positive, absolute, and unconditional. See, e.g., *Air Liquide America L.P. v. Independent Welding Distributor Coop., Inc.*, 2008 WL 2498138, at *16 (S.D. Ind. June 18, 2008); *Jay County Rural Elec. Membership Corp. v. Wabash Valley Power Ass'n*, 692 N.E.2d 905, 911 (Ind. App. 1998).[5]

---

[5] The official comments to the U.C.C. and the Indiana enactment of § 2-610 seem to invite a less stringent standard for repudiation. Comment 2 reads:

> It is not necessary for repudiation that performance be made literally and utterly impossible. Repudiation can result from action which reasonably indicates a rejection of the continuing obligation. And, a repudiation automatically results under the preceding section [§ 2-609] on insecurity when a party fails to provide adequate assurance of due future performance within thirty days after a justifiable demand therefor has been made. Under the language of this section, a demand by one or both parties for more than the contract calls for in the way of counter-performance is not in itself a repudiation nor does it invalidate a plain expression of desire for future performance. *However, when under a fair reading it amounts to a statement of intention not to perform except on conditions which go beyond the contract, it becomes a repudiation.*

Continental's argument is based on a misunderstanding about the relationship between § 2-609 and § 2-610. Because parties often invoke the two sections together, it may be useful to try to explain their differences, which courts must respect.

As discussed above, § 2-609 was a deliberate innovation, departing from prior, more general contract law, where requiring clear, absolute, and unconditional repudiation had sometimes caused practical difficulties and unjust results. See generally Larry T. Garvin, *Adequate Assurance of Performance: Of Risk, Duress, and Cognition*, 69 U. Colo. L. Rev. 71, 77–95 (1988). Section 2-609 addresses the problem of insecurity about whether the other party to the contract is willing and able to perform as promised. Reasonable grounds for insecurity can take many forms. *Id.*

Section 2-610 deals with a distinct problem, when a party communicates that it does not intend to perform as promised. Comment 1 to § 2-610 shows that the drafters of the U.C.C. took care to distinguish between these forms of repudiation:

> With the problem of insecurity taken care of by the preceding section [§ 2-609] and with provision being made in this Article as to the effect of a defective delivery under an instalment contract, anticipatory repudiation centers upon an overt communication of intention or an action which renders performance impossible or demonstrates a clear determination not to continue with performance.

Ind. Code § 26-1-2-610, cmt. 2 (emphasis added). Because we resolve this case under § 2-609, we need not resolve the tension.

Accordingly, it would be a mistake to extend the § 2-610 standard, even if it demands "clear, absolute, and unconditional" repudiation, to decide whether assurances are adequate under § 2-609.

Continental seems to argue that assurances given under § 2-609 *must* be deemed adequate unless the response is a clear, absolute, and unconditional repudiation of the contract. We disagree. That proposed rule would conflict with § 2-609 itself and its comments emphasizing the broad standard of commercial reasonableness. "A…defendant, who does not wish to forfeit the contract but is currently unable to perform, is likely to send thoroughly ambiguous signals to the other party." 1 White, Summers, & Hillman, U.C.C. § 7:2 (6th ed. 2020); 4 Anderson U.C.C. § 2-609:69 (3d ed. 2019), citing *Consolidated Edison Co. v. Charles F. Guyon, Inc.*, 98 A.D.2d 483, 484 (N.Y. App. 1984) (denying cross-motions for summary judgment; after seller announced it was closing plant, seller's statement that a new supplier could supply the goods instead, as a replacement, was not adequate assurance of performance under contract between existing parties); 4 Anderson U.C.C. § 2-609:68 (3d ed.), citing *American Bronze Corp. v. Streamway Products*, 456 N.E.2d 1295, 1303 (Ohio App. 1982) (reversing dismissal of buyer's counterclaim for seller's wrongful repudiation under § 2-610; buyer gave adequate assurance under § 2-609 when seller demanded payment of all outstanding accounts and payment of a new account within ten days, and buyer gave a check the next day for all past due accounts and promised to pay future accounts within ten days).

5.  *Section 2-609 and the Expectation of Performance*

The law no longer treats commercial contracts as moral obligations, the breach of which must be punished. Commercial contract law encourages or at least tolerates breaches that are economically efficient so long as the non-breaching party is made whole (net of transaction costs). See generally *Lake River Corp. v. Carborundum Co.*, 769 F.2d 1284, 1289 (7th Cir. 1985); Robert L. Birmingham, *Breach of Contract, Damage Measures, and Economic Efficiency*, 24 Rutgers L. Rev. 273, 284–86 (1970) ("Repudiation of obligations should be encouraged where the promisor is able to profit from his default after placing his promisee in as good a position as he would have occupied had performance been rendered"); Oliver Wendell Holmes, *The Path of the Law*, 10 Harv. L. Rev. 457, 462 (1897) ("The duty to keep a contract at common law means a prediction that you must pay damages if you do not keep it—and nothing else."). For a different view, however, see Charles Fried, *Contract as Promise: A Theory of Contractual Obligation* 17 (2d ed. 2015) ("The moralist of duty thus posits a general obligation to keep promises, of which the obligation of contract will only be a special case—that special case in which certain promises have attained legal as well as moral force. But since a contract is first of all a promise, the contract must be kept because a promise must be kept.").

Notwithstanding debates about efficient breaches, the drafters of the U.C.C. pointed out in comment 1 to § 2-609 that merchants enter into contracts because they expect performance. The right to win a lawsuit years later may be cold comfort, especially where the contract concerns a commodity essential to the business of the non-breaching party. "[T]he essential purpose of a contract between commercial men [sic] is

actual performance and they do not bargain merely for a promise, or for a promise plus the right to win a lawsuit." U.C.C. § 2-609, cmt. 1. Further, "a continuing sense of reliance and security that the promised performance will be forthcoming when due, is an important feature of the bargain. If either the willingness or the ability of a party to perform declines materially between the time of contracting and the time for performance, the other party is threatened with the loss of a substantial part of what he has bargained for." *Id.* A lack of trust undermines the value of the business relationship as a whole.

BRC was not in a position to take a chance on an interrupted supply. See U.C.C. § 2-609, cmt. 1. ("[A] buyer who believes that the seller's deliveries have become uncertain cannot safely wait for the due date of performance when he has been buying to assure himself of materials for his current manufacturing…."). Continental's communications with BRC created a lack of trust and failed to provide adequate assurance. After examining the particular factual circumstances as required under § 2-609, we find no clear error in the district court's conclusion that Continental failed to provide adequate assurance and repudiated the parties' contract.

III. *Mitigation of Damages*

Continental argues next that BRC's "cover" by buying carbon black from another supplier at a higher price amounted to an unreasonable failure to mitigate damages. The district court rejected this affirmative defense, finding that Continental had failed to prove that BRC's cover was commercially unreasonable. On appeal, Continental argues primarily that later in the summer of 2011, it offered to supply BRC again at

lower prices than BRC was paying its new supplier. We find no clear error in the district court's treatment of this issue.

A. *Events After BRC Terminated the Agreement*

As noted, on June 2, 2011, BRC terminated the contract with Continental and filed this lawsuit. The termination letter also said that BRC was willing to accept delivery of the two railcars of carbon black remaining under the April 26 purchase order, but under the prices established in the contract, if Continental confirmed that price by the close of business on June 7. Continental did not provide this confirmation, so on June 10, BRC rescinded its order for the two railcars of carbon black. BRC then agreed with another supplier to buy carbon black for the remainder of 2011 at prices higher prices than its contract with Continental. In August 2011, BRC negotiated with several carbon black suppliers for a long-term contract.

On August 19, 2011, despite the earlier repudiation and the lawsuit, BRC sent Continental a proposal for terms for a new contract. This proposal kept the baseline price of carbon black and the feedstock adjustments at the same prices required by the original contract and included a volume commitment of at least 2.7 million pounds annually. It also proposed that Continental pay BRC's new supplier a break-up fee not to exceed $90,000, as well as $10,000 in legal fees for Continental's breach of contract. Continental's national sales manager responded by saying he wanted to meet personally with BRC to discuss the proposal and to reestablish lost trust between the companies.

On August 24, 2011, Continental sent BRC a counteroffer. Continental proposed to raise the baseline price by four cents per pound for grade N762 and by three cents per pound for

grade N550 and proposed that Continental supply 2.9 million pounds of carbon black annually. BRC was disappointed by the counteroffer, and the parties did not reach a new agreement.

Instead, in October 2011, BRC reached an agreement with a competitor of Continental, Sid Richardson Carbon & Energy Co., for the supply of carbon black to BRC from January 1, 2012 to December 31, 2014. The baseline price for carbon black was higher than that in BRC's contract with Continental. BRC calculated the difference between what it paid Sid Richardson for the baseline price of the first 1.8 million pounds of carbon black per year in 2012, 2013, and 2014, and the baseline price of what it would have paid Continental for the same 1.8 million pounds under the contract. The total difference was $842,683.37, representing the damages BRC sought.

B.  *Mitigation of Damages*

Under the U.C.C., in the event of repudiation, the "injured party has the right to elect and pursue any of several remedies." *Jay County Rural Elec. Membership Corp. v. Wabash Valley Power Ass'n*, 692 N.E.2d 905, 910 (Ind. App. 1998) (citations omitted). If a party's repudiation "substantially impair[s]" the value of the contract as a whole, the non-breaching party may resort to any remedy for breach under § 2-711, which includes "cover" under § 2-712.

BRC had a duty to act reasonably to mitigate its damages, but this was an affirmative defense that Continental had the burden of proving. *Indiana Indus., Inc. v. Wedge Products, Inc.*, 430 N.E.2d 419, 428 (Ind. App. 1982) (breaching party has burden of proving that non-breaching party has not used reasonable diligence to mitigate its damages). Under § 2-712, the test

of proper cover is "whether at the time and place the buyer acted in good faith and in a reasonable manner, and it is immaterial that hindsight may later prove that the method of cover used was not the cheapest or most effective." § 2-712, cmt. 2.

Continental argues that BRC should have accepted its offer in August 2011 because it offered a better deal than Sid Richardson, with a larger overall volume and savings of over $1 million a year from 2012 to 2014. The district court found otherwise. Applying the standard of good faith and reasonableness, the district court found that BRC was not required to trust its fate to Continental any longer. BRC engaged in reasonable negotiations with other potential suppliers and agreed to commercially reasonable terms. See 2019 WL 3985900, at *15.[6]

We find no clear error in these findings that Continental failed to show that BRC did not take reasonable steps to mitigate its damages. Nor do we find clear error in the district court's finding that BRC is entitled to recover as damages the difference between the cost of the first 1.8 million pounds of carbon black that BRC purchased from Sid Richardson in 2012, 2013, and 2014, and what BRC would have paid Continental under the contract for the same 1.8 million pounds of carbon black in those same years, nor in the district court's finding that BRC is entitled to an award of its costs pursuant to Federal Rule of Civil Procedure 54(d)(1). See U.C.C. § 2-712.

---

[6] In the district court, Continental also argued that BRC failed to mitigate damages by failing to seek an injunction to require continued performance. Continental has wisely dropped that argument on appeal, for its breach could be remedied by a damages award.

IV. *Prejudgment Interest*

The final issue in this appeal is Continental's challenge to the award of prejudgment interest to BRC for the costs of its cover from 2011 through 2014. Prejudgment interest is intended to compensate a plaintiff for delay in receiving money it should have received much earlier or should not have been required to spend in the first place. See *Frey v. Hotel Coleman*, 903 F.3d 671, 682 (7th Cir. 2018) ("Courts award prejudgment interest because 'compensation deferred is compensation reduced by the time value of money,' and only prejudgment interest can make the plaintiff whole."), quoting *In re Milwaukee Cheese Wisconsin, Inc.*, 112 F.3d 845, 849 (7th Cir. 1997).

"In diversity actions…, a federal court must look to state law to determine the propriety of awarding prejudgment interest…." *Travelers Ins. Co. v. Transport Ins. Co.*, 846 F.2d 1048, 1051 (7th Cir. 1988) (applying Indiana law). Under Indiana law, interest may be awarded where the value of the damages is not in dispute and "the damages are 'ascertainable in accordance with fixed rules of evidence and accepted standards of valuation' at the time the damages accrued." *Cincinnati Ins. Co. v. BACT Holdings, Inc.*, 723 N.E.2d 436, 441 (Ind. App. 2000) (reversing denial of interest; prejudgment interest is typically appropriate "only when a 'simple mathematical computation' is required," but some interpretation is allowed "even where some degree of judgment must be used to measure damages") (citations omitted); see also *Harlan Sprague Dawley, Inc. v. S.E. Lab Grp., Inc.*, 644 N.E.2d 615, 617 (Ind. App. 1994) (affirming award of prejudgment interest; damages were ascertainable in accordance with fixed rules of evidence and accepted standards of valuation at time they ac-

crued). Prejudgment interest is not permitted for personal injuries, wrongful death, defamation, false imprisonment, malicious prosecution, assault and battery, and "all cases where the damages are incomplete and are peculiarly within the province of the jury to assess at the time of the trial." *Id.* at 619, quoting *New York, Chicago & St. L. Ry. Co. v. Roper*, 96 N.E. 468, 472 (Ind. 1911).

This standard leaves considerable play in the joints, so we generally defer to the district court's judgment. See *Frey*, 903 F.3d at 682 ("whether and how to award prejudgment interest also lies in the discretion of the district court"); see also *Dana Cos. v. Chaffee Rentals*, 1 N.E.3d 738, 751 (Ind. App. 2013) (reviewing award of prejudgment interest for abuse of discretion).

Even where the amount of actual damages is partly in dispute, courts applying Indiana law regularly award prejudgment interest. See, e.g., *Roper*, 96 N.E. at 473 (affirming interest award based on fair market value of house destroyed by fire); *Town of New Ross v. Ferretti*, 815 N.E.2d 162, 170 (Ind. App. 2004) (reversing denial of interest where itemized list showed relevant portion of damages award eligible for award); *New York Central R.R. Co. v. Churchill*, 218 N.E.2d 372, 379 (Ind. App. 1966) (affirming interest award where fair market value of tractor was disputed but easily ascertainable with a degree of certainty); see also *Luksus v. United Pacific Ins. Co.*, 452 F.2d 207, 210-11 (7th Cir. 1971) (affirming interest award based on sums owed for labor, services, equipment rental, and bonuses); *Indiana Bell Tel. Co. v. Thrifty Call, Inc.*, 2005 WL 552260, at *4 (S.D. Ind. June 29, 2005) (awarding interest where factfinder used estimate of total minutes of stolen long-distance calls to determine damages).

We do not read the cases Continental cites as undermining the interest award here. First, *Dana Companies* disapproved prejudgment interest for the total damage award where a damage calculation was based on the reasonableness of the method of cost allocation. But the court in the next paragraph reversed and remanded with instructions to award prejudgment interest for a portion of the award that was readily ascertainable. 1 N.E.3d at 751 (confirming that "prejudgment interest is considered proper where the trier of fact does not have to exercise judgment in order to assess the amount of damages"). Next, *AM General LLC v. Demmer Corp.*, 2015 WL 1256370 (N.D. Ind. Mar. 18, 2015), also does not support reversal here. The court ultimately awarded prejudgment interest for the portion of the damages that were ascertainable and not in dispute. Finally, *Anderson v. Sailing Concrete Corp.*, 411 N.E.2d 728, 735 (Ind. App. 1980), ultimately reversed an award of prejudgment interest because the actual value of the damages in question was in dispute. These cases help to clarify the line between the types of damages that are proper and improper for prejudgment interest, but they show that the calculation of the price differences between the contract prices and actual prices paid for cover were sufficiently determinate to award prejudgment interest here.

In *Public Service Co. of Indiana, Inc. v. Bath Iron Works Corp.*, 773 F.2d 783 (7th Cir. 1985), we applied Indiana law in way that is instructive here. The defendant argued that because the jury had to determine whether the plaintiff's repair costs were reasonable, prejudgment interest should not be allowed. We rejected that argument because the dispute was not about the amount of actual damages but only whether those damages were reasonable. Once that issue was resolved, the plaintiff

was entitled to interest on those ascertainable damages. *Id.* at 796–97.

In this case, BRC's actual damages amount of $842,683.37 was not only ascertainable but undisputed. Like the damage amounts in *AM General* and *Dana Companies* that were eligible for prejudgment interest, and unlike the damage amount in *Anderson*, the damage amount itself is not in dispute here. Continental disputes only whether the cover itself was reasonable based on its argument that BRC should have returned to buying from Continental rather than switching to new suppliers. We addressed those issues above. Those disputes do not affect whether, once they were resolved, prejudgment interest was proper or permissible. Once the cover itself is found reasonable, a district court may use a formula, as it did here, to calculate prejudgment interest.[7]

"Prejudgment interest is computed from the time the principal amount was demanded or due and is allowable at the permissible statutory rate when no contractual provision specifies the interest rate." *Cincinnati Ins. Co.*, 723 N.E.2d at 441 (citation omitted). Where the parties have not agreed to a specified interest rate, Indiana law directs courts to use the rate of 8% per year. *Care Group Heart Hospital, LLC v. Sawyer*, 93 N.E.3d 745, 757 (Ind. 2018), citing Ind. Code § 24-4.6-1-102. We find no error in the district court's calculation of prejudgment interest based on the damages awarded as cover for Continental's repudiation, in the amount of $383,561.12 plus

---

[7] We also agree with the district court's statement that "even if the Court had adopted Continental's version of damages, which it did not, prejudgment interest would still be appropriate in this case." *BRC Rubber & Plastics, Inc. v. Continental Carbon Co.*, 2019 WL 6487323, at *4 (N.D. Ind. Dec. 3, 2019).

$184.70 per diem through the date of judgment, for a total of $400,184.12.

For these reasons, the judgment of the district court is

AFFIRMED.