**KELSEY–HAYES COMPANY, a Delaware Corporation, Plaintiff and Counter–Defendant,**

v.

**GALTACO REDLAW CASTINGS CORPORATION, a Canadian Corporation, Galtaco, Inc., a Canadian Corporation, and Redlaw Industries, Inc., a Canadian Corporation, Defendants and Counterclaimants.**

No. 89–72881.

United States District Court, E.D. Michigan, S.D.

Oct. 30, 1990.

As Amended Nov. 7, 1990.

Mark Straitman and Thomas Sullivan, Detroit, Mich., for plaintiff and counter-defendant.

Carl VonEnde and Gary Faria, Detroit, Mich., for defendants and counter-claimants.

OPINION AND ORDER

COHN, District Judge.

I.

This is a breach of contract case. Plaintiff, Kelsey–Hayes Company (Kelsey–Hayes), alleges defendant, Galtaco Redlaw Castings Corporation (Galtaco)[1], breached a three-year agreement (the 1987 contract) for the purchase of castings. In addition

---

1. Three separate defendants are named in this action. On or about August 1, 1988, two of the defendants, Galtaco, Inc. and Redlaw Industries, Inc., entered into an agreement to transfer their respective foundry and industrial products operations to a newly formed corporation, Galtaco Redlaw Castings Corporation. For the purpose of this motion, the three companies will be referred to as Galtaco.

to the damages allegedly suffered as a result of the breach of the 1987 contract, Kelsey–Hayes seeks a declaratory judgment that it does not have to pay Galtaco price increases to which it agreed in 1989. Kelsey–Hayes asserts the 1989 contract modifications (1989 agreements) containing the price increases (1) were agreed to by Kelsey–Hayes under duress, (2) were unconscionable, (3) were demanded by Galtaco in bad faith and (4) constitute unjust enrichment to Galtaco. Galtaco says in response that Kelsey–Hayes waived its breach of contract claims and, in addition, argues that the defenses Kelsey–Hayes raises regarding the validity of the 1989 agreements have no merit. Galtaco also counterclaims for the monies owed under the 1989 agreements. Also before the Court is Kelsey–Hayes' motion for leave to file a second amended complaint. Fed.R. Civ.P. 15(a).

Galtaco has moved for summary judgment, Fed.R.Civ.P. 56, on Kelsey–Hayes' claims and its counterclaim. For the reasons which follow, Galtaco's motion will be denied. In addition, the Court will grant Kelsey–Hayes' motion for leave to file a second amended complaint.

## II.

The following facts as gleaned from the affidavits, deposition testimony and documents in the record are not in dispute.[2]

Kelsey–Hayes makes brake assemblies that it sells to auto manufacturers, including Chrysler and Ford. For several years prior to 1987, Galtaco supplied castings to Kelsey–Hayes which incorporated them into the brake assemblies. In 1987, Galtaco and Kelsey–Hayes signed a three-year "requirements" contract. Under the contract, Galtaco was to be the sole source to Kelsey–Hayes of certain types of castings through April 1990. In return, Galtaco was to charge fixed prices for 1987, and scheduled price reductions for 1988 and 1989, respectively.

During and after 1987, Galtaco also supplied certain other castings to Kelsey–

Hayes under 100 percent supply blanket purchase orders (purchase orders) of indefinite duration.[3]

### A.

By the spring of 1989, Galtaco had been experiencing continued monetary losses for several years. Kelsey–Hayes was aware of Galtaco's financial condition. For the seven months ending in April 1989, Galtaco's foundry operations had losses totalling $2,410,000. As a result, on May 10, 1989, Galtaco's Board of Directors made final a decision to discontinue its foundry operations and cease production of castings. Galtaco recognized that an immediate shut down of its foundry operations would seriously inconvenience its customers, because they would need additional castings before they could cover from other sources. Therefore, Galtaco offered all of its customers, including Kelsey–Hayes, an agreement to keep its foundries operating for "several months" in exchange for price increase of 30 percent effective with shipments of May 15, 1989.

If Galtaco were to have immediately terminated its foundry operations, Kelsey–Hayes concluded that it would not have been able to obtain a sufficient supply of castings from alternative sources for 18–24 weeks. As a result, Kelsey–Hayes determined that declining to accept Galtaco's offer would have the effect of shutting down the assembly plants of two of its major clients, Chrysler and Ford. Kelsey–Hayes was Ford's sole source of certain brake assemblies, and Ford had no significant bank of those parts. Any interruption of the supply of brake assemblies longer than five to ten days would likely have resulted in the halting of Ford production of a vehicle line. On May 12, 1989, Kelsey–Hayes accepted Galtaco's offer to continue supplying castings for a time, at a 30 percent price increase for all castings delivered to all plants. Before entering into the 1989 agreements, Kelsey–Hayes did not re-

2. In keeping with the Court's practice, Galtaco filed a statement of material facts not in dispute together with excerpts from the record in support of its assertions. Kelsey–Hayes responded.

Galtaco's fact statement is not contradicted by Kelsey–Hayes in any essential part.

3. These purchase orders are the subject of Kelsey–Hayes' motion to amend its complaint.

serve any rights under the 1987 contract when it accepted Galtaco's offer.

On June 9, 1989, Galtaco informed Kelsey–Hayes it required an additional 30 percent price increase in order to keep its foundry operations going. By this time, Galtaco's other customers had found alternative sources of castings. The additional price increase was asked for to offset the rising fixed costs Galtaco would continue to incur if it were to remain in operation for Kelsey–Hayes' sole benefit. Since Kelsey–Hayes had not yet found another source for castings, it accepted Galtaco's offer to continue providing castings for an additional 30 percent price increase. Again, Kelsey–Hayes did not reserve any rights under the 1987 contract when it entered into the June 1989 agreement.

### B.

Between May 15 and August 30, 1989, Galtaco made 282 shipments to Kelsey–Hayes. Galtaco's foundries closed down after the final shipment to Kelsey–Hayes.

Kelsey–Hayes accepted all of the shipments, and it timely paid for the first 197 deliveries according to the terms of the 1989 agreements. However, Kelsey–Hayes failed to pay Galtaco for 84 of the remaining 85 casting shipments. The price for the 84 shipments for which Kelsey–Hayes has not paid approximates the $2 million price increase to which Kelsey–Hayes agreed under the 1989 agreements.

At no time did Kelsey–Hayes explicitly state that it would sue Galtaco; however, Kelsey–Hayes did strenuously protest Galtaco's actions as a breach of the 1987 contract.

### III.

As stated, *supra,* Kelsey–Hayes' claim is based on several alternative theories of lia-

bility. However, in order to dispose of the pending motion, the Court must only decide whether Kelsey–Hayes has presented enough evidence to allow a reasonable finder of the facts to conclude the 1989 agreements were executed under duress.[4]

### A.

■ Galtaco says Kelsey–Hayes cannot sue for breach of the 1987 contract, because it entered into the superseding 1989 agreements. It is true that under Michigan law, entering a superseding, inconsistent agreement covering the same subject matter rescinds an earlier contract and operates as a waiver of any claim for breach of the earlier contract not expressly reserved. *Joseph v. Rottschafer,* 248 Mich. 606, 610–611, 227 N.W. 784 (1929); *Culver v. Castro,* 126 Mich.App. 824, 827–828, 338 N.W.2d 232 (1983). However, a subsequent contract or modification is invalid and therefore does not supersede an earlier contract when the subsequent contract was entered into under duress. *Lafayette Dramatic Production v. Ferentz,* 305 Mich. 193, 217–219, 9 N.W.2d 57 (1943). There is sufficient evidence to allow a reasonable finder of the facts to determine that Kelsey–Hayes was under duress when it executed the 1989 agreements. Thus, Galtaco's motion for summary judgment will be denied.

### B.

■ Courts in Michigan have recognized the doctrine of economic duress or "business compulsion" for more than a century. *Hackley v. Headley,* 45 Mich. 569, 8 N.W. 511 (1881). Galtaco relies on early statutory and judicial general expressions of the doctrine stating that in order to make a claim of duress, a person must be subjected to the threat of an unlawful act

4. As to the claim of unconscionability, as distinguished from duress, it appears to lack merit. *See Northwest Acceptance Corp. v. Almont Gravel, Inc.,* 162 Mich.App. 294, 412 N.W.2d 719 (1987). The claim of bad faith likewise appears to lack merit, *see Genesee Merchants Bank &*

*Trust Co. v. Tucker Motor Sales,* 143 Mich.App. 339, 372 N.W.2d 546 (1985), as does the claim of unjust enrichment, *see Hollowell v. Career Decisions, Inc.,* 100 Mich.App. 561, 570, 298 N.W.2d 915 (1980).

in the nature of a tort or a crime. *See Burke v. Gould,* 105 Cal. 277, 281–283, 38 P. 733 (1894). However, the doctrine of duress has been greatly expanded since its common-law origin.[5] Now, a contract is voidable if a party's manifestation of assent is induced by an improper threat by another party that leaves the victim no reasonable alternative. *Rich & Whillock v. Ashton Development,* 157 Cal.App.3d 1154, 204 Cal.Rptr. 86, 89 (1984); *Systems Technology Associates, Inc. v. United States,* 699 F.2d 1383, 1387 (Fed.Cir.1983); Restatement (Second) of Contracts, § 175(1) (1982). In other words, economic duress can exist in the absence of an illegal threat; the threat must merely be wrongful. Even acts lawful and non-tortious may be wrongful depending on the circumstances. S. Williston & W. Jaeger, *Williston on Contracts* § 1606 (3rd ed. 1972); *Fowler v. Mumford,* 48 Del. 282, 102 A.2d 535 (Del.Super.1954).

### C.

### 1.

■ Kelsey–Hayes has alleged wrongful acts of Galtaco in its complaint and has offered proof of them in affidavits. Specifically, Kelsey–Hayes says Galtaco threatened to breach its contract and go out of business, stopping production and delivery of castings, unless Kelsey–Hayes agreed to significant price hikes. *Austin Instrument, Inc. v. Loral Corp.,* 29 N.Y.2d 124, 324 N.Y.S.2d 22, 272 N.E.2d 533 (1971) (threat by one party to breach contract by not delivering required items is wrongful).

### 2.

Kelsey–Hayes has also presented a triable issue of fact that it had no reasonable alternative other than acquiescing to Galtaco's demand for a contract modification. Affidavits and deposition testimony in the record show Kelsey–Hayes contacted six other casting manufacturers, but none were able to immediately provide an alternate source of castings to meet Kelsey–Hayes' delivery requirements.[6] As a re-

---

**5.** A survey of Michigan cases involving duress reveals that there has never been a decision that explicitly adopts the modern formulation of duress. *See Stefanac v. Cranbrook Educational Community,* 435 Mich. 155, 194 n. 40, 458 N.W.2d 56 (1990) (Levin, J., dissenting) (recognizing that despite the general enlargement of the doctrine of duress, the law in Michigan may have lagged behind); *Apfelblat v. National Bank Wyandotte–Taylor,* 158 Mich.App. 258, 263–264, 404 N.W.2d 725 (1987) (per curiam) (duress is defined as requiring compulsion or coercion by one which is "illegally" forced to act by fear of serious injury to person, reputation or fortune).

A superficial reading of the few Michigan decisions indicates that, while the dimensions of the duress doctrine have expanded in other jurisdictions, Michigan courts continue to apply the restrictive principles of the early common-law. The decisions routinely cite *Hackley,* in which the Michigan Supreme Court states that a threat must be unlawful, not merely wrongful, in order for there to be duress. In these cases, the courts' inquiries have consistently focused on whether the coercing party engaged in unlawful acts. *Barnett v. International Tennis Corp.,* 80 Mich.App. 396, 405, 263 N.W.2d 908 (1978); *Apfelblat,* 158 Mich.App. at 264, 404 N.W.2d 725; *Beachlawn Building Corp. v. City of St. Clair Shores,* 370 Mich. 128, 121 N.W.2d 427 (1963); *Norton v. State Highway Department,* 315 Mich. 313, 320, 24 N.W.2d 132 (1946); *Lafayette Dramatic Productions, Inc. v. Ferentz,* 305 Mich. 193, 216, 9 N.W.2d 57 (1943).

Nevertheless, the Court is satisfied that if the Michigan Supreme Court looked at the issue today, it would rule that ecomonic duress need not stem from an "illegal" threat. No Michigan decision affirmatively states that Michigan has rejected the modern interpretation of economic duress. In fact, a recent case interpreting Michigan law held that economic duress can flow from a "wrongful or unlawful" act. *Transcontinental Leasing, Inc. v. Michigan National Bank of Detroit,* 738 F.2d 163, 166 (1984). Also, Michigan decisions cite with apparent approval Professor Williston's treatise on contracts which states that a claim of economic duress can be based on a perpetrator's "wrongful" act. *See Barnett v. International Tennis Corp.,* 80 Mich. App. at 406, 263 N.W.2d 908 (citing 13 S. Williston on Contracts, § 1617, p. 704 (3rd ed. 1972)). Thus, while the Michigan Supreme Court has not explicitly embraced the modern interpretation of economic duress, there is no reason to believe it would not do so if presented with a fact pattern requiring its consideration. *See Dunbar v. United States Insurance Co. of America,* 557 F.Supp. 228 (E.D.Mich.1983) (in diversity cases, federal court must make educated guess what state Supreme Court would decide if question was presented to it, and decisions of state trial and appellate courts, while they may be considered, cannot serve as precedent).

**6.** By the time Galtaco demanded the second 30 percent price increase, most of its other customers other than Kelsey–Hayes were able to acquire alternate supplies of castings. Galtaco says this suggests Kelsey–Hayes also could have obtained another source of supply, and thus it

sult, Kelsey–Hayes might reasonably have believed a brief interruption in casting shipments would force at least one of its major customers, Ford, to halt production of a vehicle line. Such an occurrence, Kelsey–Hayes could reasonably fear, would injure its business reputation and subject it to large monetary damages.[7] The facts in this case parallel *Austin Instrument, supra,* in which a government contractor faced a genuine possibility of substantial liquidated damages as a result of a subcontractor's threat to stop deliveries unless prices were increased. In *Austin Instrument,* 324 N.Y.S.2d at 26–27, 272 N.E.2d at 537–538, the court held that a company in this position was deprived of its free will and had no alternative other than acquiescing to the demands of the party threatening to breach its contract. Similarly, faced with the imminent shutdown of its major customer's plants, Kelsey–Hayes may have had no alternative other than agreeing to Galtaco's "requests" for price increases.[8] *See also Pittsburgh Steel Co. v. Hollingshead & Blei,* 202 Ill.App. 177 (1916); *Ross System v. Linden Dari–Delite,* 35 N.J. 329, 173 A.2d 258 (1961); *Rose v. Vulcan Materials Co.,* 282 N.C. 643, 194 S.E.2d 521

(1973); *King Construction Co. v. W.M. Smith Electric Co.,* 350 S.W.2d 940 (Tex. Civ.App.1961).

It is hardly necessary to add that Kelsey–Hayes' normal legal remedy of accepting Galtaco's breach of the contract and then suing for damages would have been inadequate under the circumstances. Kelsey–Hayes might reasonably have feared that if it shunned the 1989 agreements and instead sued for breach of the 1987 contract then Galtaco would have stopped supplying it with castings.[9] As stated, *supra,* evidence in the record strongly suggests Kelsey–Hayes would not have been able to locate an alternate supply of castings. As a result, Kelsey–Hayes' business reputation may have suffered and its major customers may have been forced to shut down its automobile production lines.

3.

■ In order to state a claim of economic duress a buyer coerced into executing a modification to an existing agreement must "at least display some protest against the higher price in order to put the seller on notice that the modification is not freely entered into." *United States v. Progres-*

was not under economic duress when it assented to the latter 1989 agreement. But this merely presents an issue to be resolved by the trier of fact. Moreover, when seeking alternate supplies of castings, Kelsey–Hayes may have faced more difficulty than Galtaco's other customers. Kelsey–Hayes had to source 30 different safety related castings representing perhaps 45%–50% of the total output of the Galtaco foundries.

7. Given the changing nature of the automobile industry, Galtaco's actions are more likely to constitute duress. It is well known that in an effort to promote efficiency, car manufacturers are reducing the size of their reserve banks of parts. As a result, component parts are often incorporated into a finished product within a few hours of their delivery. A supplier's failure to make scheduled shipments may have immediate and dramatic consequences. Aware of this, companies in the position of Kelsey–Hayes will face more pressure to agree to the extortionate demands of suppliers who breach their contractual obligations. Thus, a breach of contract in the automotive industry may be more coercive than in other industries.

8. The facts here also mirror an example of economic duress cited in Restatement (Second) of

Contracts, § 175 comment b, illustration 5 (1982):

A, who has contracted to sell goods to B, makes an improper threat to refuse to deliver the goods to B unless B modifies the contract to increase the price. B attempts to buy substitute goods elsewhere but is unable to do so. Being in urgent need of the goods, he makes the modification. See Uniform Commercial Code § 2–209(1). B has no reasonable alternative, A's threat amounts to duress, and the modification is voidable by B.

9. Galtaco's chief operating officer, T. Cook, testified as follows:

We had conveyed to all of our customers that we needed a written acceptance of the 30 percent price increase or we would not make shipments on May 15th, which was a Monday. The Monday shipments were prepared on Friday night and were shipped out Sunday night. Our shipping supervisors had instructions that those shipments were not to be made unless they had been given approval by me or through someone designated by me that we had, in fact, received those written approvals. Late on Friday we still had not received those from anyone in Kelsey–Hayes. And Ron Olwean called me to find out what he had and how to do it.

*sive Enterprises,* 418 F.Supp. 662, 665 (E.D.Va.1976) (in contract modification situations, the parties must be able to rely on objective, unequivocal manifestations of assent). Galtaco says Kelsey–Hayes executed the 1989 agreements with the secret intention to never pay the higher prices. However, it is undisputed Kelsey–Hayes vigorously objected to Galtaco's breach of the 1987 contract and its demand for price increases. While Kelsey–Hayes did not expressly reserve the right to sue under the 1987 contract, a reasonable trier of the facts could determine its protests effectively put Galtaco on notice that the 1989 agreements were agreed to under duress.[10]

### D.

■ Galtaco argues, in effect, that the common law doctrine of economic duress no longer applies to cases like the one at bar. Instead, Galtaco says, the doctrine has been subsumed by the Uniform Commercial Code's "good faith" test, M.C.L. § 440.2209, for determining the enforceability of agreements modifying contracts for the sale of goods. This contention is frivolous. Galtaco relies on a single case, *Roth Steel Products v. Sharon Steel Corp.,* 705 F.2d 134 (6th Cir.1983), to support its contention that a well-established tenet of law has been abandoned. Moreover, the Court of Appeals for the Sixth Circuit in *Roth Steel* never even held that a person can no longer rely on the doctrine of economic duress to invalidate a contract modification.[11] Finally, M.C.L. § 440.1103 states that, absent explicit language to the contrary, the Uniform Commercial Code merely supplements the common law of duress and coercion. M.C.L. § 440.2209 contains no such language.

### IV.

Kelsey–Hayes' motion to amend the complaint to include allegations that Galtaco breached its obligations under various purchase orders will be granted. It appears that in negotiating the 1989 agreements, both parties overlooked the terminable nature of the purchase orders and failed to distinguish castings covered by the 1987 contract and castings covered by the purchase orders.

Galtaco opposes Kelsey–Hayes' motion to amend on essentially three grounds: (1) the motion is not based on any newly discovered facts, (2) the motion is an attempt by Kelsey–Hayes' to delay final adjudication of this case, and (3) Galtaco would be

---

**10.** Assuming *arguendo* Kelsey–Hayes did not enter into the 1989 agreements under duress, it still has a viable cause of action against Galtaco. M.C.L. § 440.2712 states:

(1) After a breach within the preceding section the buyer may "cover" by making in good faith and without unreasonable delay and reasonable purchase or contract to purchase goods in substitution for those due from the seller.

(2) The buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages as hereinafter ... but less expenses saved in consequences of the seller's breach.

(3) Failure of the buyer to effect cover within this section does not bar him from any other remedy.

Thus, Kelsey–Hayes' execution of the 1989 agreements may be viewed as a successful effort to "cover" after Galtaco's breach of the 1987 contract. As a result, Kelsey–Hayes would be entitled to damages under the "cover" provisions of the Uniform Commercial Code as adopted in Michigan.

Galtaco says Kelsey–Hayes' buying the same goods, from the same seller, on different terms is not "cover" under M.C.L. § 440.2712. However, this contention stems from an overly restrictive reading of the section. *See Calbag Metals Co. v. Guy F. Atkinson Co.,* 770 P.2d 600, 603 n. 6 (Or.App.1989) (court assumes that buying the same goods from the seller at a higher price could qualify as cover under the Uniform Commercial Code § 2–712, which is identical to M.C.L. § 440.2712).

**11.** Galtaco says that in *Roth Steel* the Court of Appeals "implicitly" held that a contract modification is per se valid if it was executed in good faith. However, Galtaco's interpretation is difficult to understand. When determining a modification's validity, *Roth Steel,* 705 F.2d at 146 n. 24, expressly states that a court must consider an issue distinct from good faith: unconscionability. In addition, the language in *Roth Steel,* 705 F.2d at 148 n. 31, on which Galtaco relies, in fact, contradicts its argument. Instead of holding that a contract modification is not voidable unless there is bad faith, the Court of Appeals seems to recognize that economic duress can at times be an independent reason for invalidating such "agreements."

prejudiced by the discovery ramifications of the Court's granting the motion to amend. None of these contentions have merit.

### V.

Galtaco's motion for summary judgment is DENIED. Kelsey–Hayes' motion to amend is GRANTED.

SO ORDERED.