# In the Iowa Supreme Court

No. 24–1158

Submitted February 18, 2026—Filed April 24, 2026

**CMT Highway, LLC,**

Appellant,

vs.

**Logan Contractors Supply, Inc.,**

Appellee.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Cedar County, Jeffrey D. Bert, business specialty court judge.

Breaching seller in a sale of goods challenges whether a buyer's purchase of "cover" goods complied with Iowa Code section 554.2712. **Decision of the Court of Appeals Affirmed in Part and Vacated in Part; District Court Judgment Affirmed in Part, Vacated in Part, and Case Remanded.**

Oxley, J., delivered the opinion of the court, in which all justices joined.

Molly M. Parker (argued), Steven J. Pace, Samuel E. Jones, and Kate Thorne of Shuttleworth & Ingersoll, Cedar Rapids, and Joseph C. Creen of Bush, Motto, Creen, Koury & Halligan, PLC, Davenport, for appellant.

Michael W. Thrall (argued) and Matthew A. McGuire of Nyemaster Goode, P.C., Des Moines, and Roy Leaf of Nyemaster Goode, P.C., Cedar Rapids, for appellee.

**Oxley, Justice.**

When a seller breaches a contract for the sale of goods, the buyer can choose to "cover" its loss by procuring substitute goods. Iowa Code § 554.2712(1) (2022). If the buyer makes "any reasonable purchase of . . . goods in substitution for those due from the seller," then the buyer can recover damages from the seller for the difference between the more expensive substitute and the parties' original contract. *Id.* § 554.2712(1)–(2); *accord Kanzmeier v. McCoppin*, 398 N.W.2d 826, 831–32 (Iowa 1987). This dispute concerns how a breaching seller's offer to sell the same goods from the initial contract at a higher price affects the buyer's cover remedy under section 554.2712. We hold that an aggrieved buyer is not required to deal with the breaching seller in exercising its right to cover. We also hold that substantial evidence supports the district court's finding that the buyer properly mitigated its damages for the breach because its purchase of substitute goods from other vendors at then-current market prices was reasonable, despite the breaching seller's lower offer.

**I. Factual Background and Proceedings.**

**A. The Parties' Relationship.** A five-year business relationship between CMT Highway, LLC (CMT) and Logan Contractors Supply, Inc. (Logan Contractors) came to an end in 2021. The parties worked together on road-construction projects, manufacturing and supplying materials to general contractors who build or repair roads and highways for government entities. CMT manufactures dowel baskets, tie bar assemblies, loose dowel bars and tie bars, and other wire products. When concrete is poured for a road, dowel baskets are used at the saw joints to hold the adjoining slabs of concrete together, and the dowel bar assemblies help prevent the road from buckling.

Logan Contractors supplies goods and materials, including the dowel products like those produced by CMT, to general contractors for concrete paving projects.

The bidding process for public road projects is competitive. Government entities post sets of plans with a specified completion date, requesting quotes from general contractors. General contractors then solicit quotes from suppliers like Logan Contractors, who in turn solicit quotes from manufacturers like CMT. The relationships between contractors in the paving industry tend to be collaborative because government entities ordinarily select the lowest bid. It is understood in the industry that contractors rely on the quotes they receive to make bids, though reasonable modifications to quotes are not uncommon after a quote has been accepted.

On any given project, CMT and Logan Contractors operated on a rolling delivery schedule for the goods because delivery dates in the industry are often a moving target and depend on factors outside the control of the manufacturer and supplier. When Logan Contractors was awarded a project, it would notify CMT and confirm the price included in CMT's quote. CMT's quotes generally limited the length of time it would honor a price under the "TERMS" provision. Many of the quotes covering the projects at issue in this dispute set a "firm through" date of December 31, 2021, and noted that "deliveries occurring after this date are subject to an additional charge to be determined." Two quotes CMT provided in 2021 also laid out a set percentage increase (four percent in one, five percent in the other) "[s]tarting January 1, 2022 and every 6 months thereafter." A project could take several months to complete, and the government contractor only needed a portion of the products at a time, which CMT delivered directly to the project site. So CMT used a just-in-time manufacturing process to avoid storage costs, waiting to begin manufacturing until it received a purchase order

from Logan Contractors that confirmed a delivery date and the required load. Given the different delivery dates for the products, several purchase orders covered a single project.

CMT and Logan Contractors fulfilled more than three hundred purchase orders from 2018 to 2021, which generated well over $10 million in revenue for CMT. Logan Contractors was CMT's biggest customer, receiving as much as forty-five percent of the dowel baskets that CMT produced in a year. CMT was one of four contractors that Logan Contractors solicited for quotes on road-construction projects. CMT's ability to produce goods at low cost made Logan Contractors highly competitive in bidding for projects. The arrangement was mutually beneficial: CMT had a reliable stream of orders while Logan Contractors received quality product at a low price.

**B. The COVID-19 Pandemic's Effects on the Market.** The business relationship unraveled in 2021. Global supply chain issues stemming from the COVID-19 pandemic caused the availability of steel to decline and the price of steel to skyrocket, and trucking shortages disrupted the parties' production schedule. These challenges made it difficult for CMT to perform on time and at the price that it had previously agreed to with Logan Contractors. CMT began missing delivery dates because of the supply chain issues in June 2021. CMT assured Logan Contractors over a phone conversation that things would be fine despite the supply chain issues and that CMT would honor the prices on existing projects. Logan Contractors reached out in September to set up a meeting to discuss the "tough year" and "follow up on the challenges of this year with CMT and how/if there is a remedy for th[o]se." That meeting never occurred.

CMT shortly thereafter declined to provide a quote for a new project that Logan Contractors requested in late October. Instead, CMT emailed

Logan Contractors the following ultimatum on October 27, demanding a price increase on its existing orders or the parties would stop working with each other altogether:

> After studying the numbers and reviewing our notes from the conversation this morning, I have come up with the following proposals:
>
> 1. CMT will continue to quote Logan [Contractors] on jobs they are sent quotes for and manufacture and deliver everything they currently have orders for with the following increases:
>
> 1.5 material will be billed at $6.95 a foot delivered price
>
> 1.25 material will be billed at $5.25 a foot delivered price
>
> 1.00 material will be billed at $3.90 a foot delivered price
>
> [0].75 material will be billed at $2.80 a foot delivered price
>
> Basket Stakes will be at $[0].06 higher than current cost
>
> These prices represent a cost that is well below current pricing but allows us to pass on the impact of our higher material cost and would pertain to all existing orders on the books as of today. We would not pass on any shipping cost as CMT will eat the cost of the freight.
>
> All material currently on the backlog would be manufactured and paid for by March 31, 2022. Any new work moving forward would be billed at negotiated price at time of order. Also, any additional orders will receive a $1,000 rebate per order (minimum a truckload of material) until the difference on original price and new price is made up.
>
> 2. Logan [Contractors] rejects proposal 1 as written, at which time CMT Highway LLC[] and Logan [Contractors] decide to end their working relationship and go their separate ways.
>
> Also, if you decide to move on, I want to thank you for your business over the years. I wish you continued success on the personal and business side. The ball is in your court and I will need an answer by EOB on Friday. Thanks!

Logan Contractors sought clarification about CMT's email the next day. CMT confirmed that existing projects at Offutt Air Force Base would be excluded from

the first option's price increases but that the Offutt projects would be included in the second option ending all business relations between the parties. Legal counsel for Logan Contractors informed CMT the following week that Logan Contractors considered CMT to be in breach of its existing purchase orders, so Logan Contractors would procure substitute goods from other companies.

Within a couple of weeks, Logan Contractors solicited bids from three other manufacturers for the twelve projects that CMT refused to perform at the original contract price. Logan Contractors selected the bid from the alternative manufacturer offering the lowest price that could also meet the time demands of each project. Logan Contractors bought substitute goods from two manufacturers: CMC Paving Solutions and American Highway. The substitute goods were purchased at or slightly below the standard market rate in 2021, amidst the pandemic-induced supply chain issues. A representative for CMC Paving Solutions testified at trial that the company reduced its margin by "about two to three percent" to "try[] to help minimize the damage" from Logan Contractors' fallout with CMT. Ultimately, Logan Contractors spent $1,529,264.57 over CMT's original contract price purchasing substitute goods after CMT's failure to perform on the twelve projects. In contrast, CMT's demanded price increases totaled $310,082.08 above the contracted prices, but even those higher prices would have reflected a fifteen to twenty percent loss for CMT on each job.

**C. Legal Proceedings.** In March 2022, CMT sued Logan Contractors for breach of contract because Logan Contractors withheld payments to CMT for materials it provided before the parties' relationship broke down. Logan Contractors filed a countersuit, alleging claims for breach of contract and

promissory estoppel. The case was placed on the business court docket and proceeded to a four-day bench trial, after which the district court issued a thorough thirty-six-page opinion. It concluded that Logan Contractors was liable to CMT for breach of contract in the amount of $965,232.21, while CMT was liable to Logan Contractors on the breach-of-contract counterclaim in the amount of $1,529,264.57. The court offset CMT's liability by the amount Logan Contractors owed for wrongfully withholding payments after CMT's breach.

Both parties appealed, and we transferred the case to the court of appeals. CMT argued that the district court erred in three ways: (1) by finding that contracts were formed on the projects CMT allegedly breached and that CMT in fact breached the contracts if they were formed; (2) by concluding that Logan Contractors' acceptance of cover goods was reasonable when it did not accept the cheapest alternative bid (referring to its own price-increase proposal); and (3) by miscalculating the damages CMT owed. Logan Contractors' cross-appeal challenged the trial court's awards of prejudgment and postjudgment interest.

The court of appeals affirmed the district court with respect to CMT's appeal. It held that, based on the parties' course of dealing since 2016, CMT and Logan Contractors were contractually bound to the quoted prices once Logan Contractors was awarded a project and accepted CMT's quote, despite the lack of firm delivery dates. The court of appeals then held that CMT breached those contracts when it sent the October 27 email demanding a price increase on existing projects or an end to the parties' working relationship. As the district court found, that email was not an attempt to renegotiate the contracts' terms but rather a notification that CMT would not perform under the key pricing term

of the contracts. And the contracts were not successive performance contracts under Iowa Code section 554.2309(2) that CMT could terminate through reasonable notification. The court of appeals also concluded that Logan Contractors' damages included the Offutt projects. Even if those projects were not subject to price increases, CMT refused to perform the Offutt projects unless Logan Contractors accepted higher prices on the other existing projects.

The court of appeals held that the plain language of Iowa Code section 554.2712 defeated CMT's argument that Logan Contractors acted unreasonably when it spent over $1.5 million to cover, even though it could have received the same products from CMT for just over $300,000. According to the court of appeals, CMT's postbreach offer to sell the same goods at a higher price could not be considered cover because "identical" goods cannot be "substitute" goods. So Logan Contractors complied with section 554.2712 by purchasing reasonable alternatives that were priced at or slightly below market rate. The court of appeals further reasoned that, notwithstanding section 554.2712, CMT's postbreach offer was not a suitable alternative under common law principles from Restatement (Second) of Contracts section 350 comment *e.* The court construed CMT's rebate provision as a surrender of Logan Contractors' right to seek damages for the breach.

Regarding Logan Contractors' cross-appeal concerning the district court's interest calculations, CMT did not dispute that the district court's order improperly double-counted prejudgment interest. The district court included $192,716.85 of interest in the total amount of the judgment against Logan Contractors, but then imposed interest on the total judgment amount, awarding interest on interest. The court of appeals vacated the judgment and ordered a remand to correct the inflated judgment. As for postjudgment interest,

the court of appeals held that Logan Contractors did not preserve error on its claim that the district court used the wrong interest rate and wrong start date.

CMT sought further review, and we granted its application. We limit our opinion to the issues raised in CMT's application for further review concerning Logan Contractors' mitigation efforts in purchasing cover goods. Having reviewed the other issues raised in the parties' respective appeals, we let the court of appeals' decision stand as to contract formation, breach, damages for the Offutt projects, and Logan Contractors' cross-appeal on prejudgment and postjudgment interest. *See* Iowa R. App. P. 6.1103(1)(*a*)(3); *see also Holmes v. Pomeroy*, 959 N.W.2d 387, 389 (Iowa 2021) ("We have discretion to choose which issues we review when we take a case on further review."); *Hills Bank & Tr. Co. v. Converse*, 772 N.W.2d 764, 770 (Iowa 2009) (exercising discretion to address one issue on further review while letting the court of appeals' opinion stand as the final decision on all remaining issues).

**II. Analysis.**

CMT's appeal raises the application of "cover" as set forth in Iowa Code section 554.2712. CMT argues that Logan Contractors failed to mitigate its damages following CMT's breach by rejecting CMT's offered price increases ($310,082.08) and instead purchasing goods from other manufacturers for nearly five times its proposed increase ($1,529,264.57). Relying on a comment to Restatement (Second) of Contracts section 350, CMT claims that rejecting the lowest-priced substitute to the original deal—i.e., its own offer at the increased prices—was unreasonable cover under section 554.2712. *See* Restatement (Second) of Conts. § 350 cmt. *e*, at 130 (A.L.I. 1981). As explained below, CMT's argument goes to mitigation of damages—a common law affirmative defense that supplements Iowa's codification of the Uniform Commercial Code (IUCC). That

argument is distinct from whether a breaching seller's higher-priced demand should be considered "cover" under section 554.2712. Understood in the proper context, we affirm the district court's finding of fact that Logan Contractors' mitigation efforts were reasonable.

"The standard of review for a breach of contract action is for correction of errors at law." *Iowa Mortg. Ctr., L.L.C. v. Baccam*, 841 N.W.2d 107, 110 (Iowa 2013). The trial court's factual findings have the force of a special verdict because this case was tried to the bench. *E.g., Metro. Prop. & Cas. Ins. v. Auto-Owners Mut. Ins.*, 924 N.W.2d 833, 839 (Iowa 2019); *Grall v. Meyer*, 173 N.W.2d 61, 63 (Iowa 1969). Those findings bind our review "if supported by substantial evidence." Iowa R. App. P. 6.904(3)(*a*); *accord UE Loc. 893/IUP v. State*, 997 N.W.2d 1, 15 (Iowa 2023); *Metro. Prop. & Cas. Ins.*, 924 N.W.2d at 839. "Evidence is substantial if a reasonable mind would accept it as adequate to reach the same findings." *Meyers v. Delaney*, 529 N.W.2d 288, 289–90 (Iowa 1995). "We view the evidence 'in the light most favorable to the trial court's judgment.' " *Brokaw v. Winfield-Mt. Union Cmty. Sch. Dist.*, 788 N.W.2d 386, 388 (Iowa 2010) (quoting *Miller v. Rohling*, 720 N.W.2d 562, 567 (Iowa 2006)); *accord Grall*, 173 N.W.2d at 63 ("[W]e construe the evidence broadly to uphold, rather than defeat, the trial court's judgment.").

**A. The IUCC's "Cover" Remedy.** Chapter 554 of the Iowa Code contains the IUCC. Article 2 of the IUCC "applies to transactions in goods." Iowa Code § 554.2102. " '*Goods*' means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale . . . ." *Id.* § 554.2105(1). It is undisputed that Article 2 of the IUCC governs this case. As the district court concluded and the court of appeals affirmed, CMT was bound to provide goods for twelve projects but breached its agreements when it refused

to perform unless Logan Contractors paid a higher price for the contracted products.

Under the IUCC, when a seller breaches a contract for the sale of goods by refusing to provide the goods, the aggrieved buyer generally has two options for seeking damages from the seller. *See* Iowa Code § 554.2711(1). It can sue the seller for nondelivery or repudiation, *see id.* § 554.2711(1)(*b*), and then recover as damages the difference between the market price at the time it learns of the breach and the contract price, *see id.* § 554.2713(1). Or it can procure substitute goods, *id.* § 554.2711(1)(*a*), and then recover as damages the difference between the cost of the substitute goods and the contract price, *id.* § 554.2712(2). This second option is called "cover." *Id.* § 554.2711(1)(*a*).

The parties disagree about whether a breaching seller's offer of the same goods at a higher price can be considered "cover" for purposes of section 554.2712. Logan Contractors argues that it cannot, urging that the language of section 554.2712—defining "cover" as the "purchase [of] goods in substitution for those due from the seller"—necessarily excludes identifying the breaching seller's own goods as a proper cover. Identical goods from the original contract, it argues, are the opposite of substitute goods. CMT counters that a comment to Restatement (Second) of Contracts section 350 rejects Logan Contractors' position by recognizing a breaching seller's goods as a "suitable alternative." *See* Restatement (Second) of Conts. § 350 cmt. *e*, at 130 ("If the party in breach offers to perform the contract for a different price, this may amount to a suitable alternative. But this is not the case if the offer is conditioned on surrender by the injured party of his claim for breach." (citation omitted)). The court of appeals rejected CMT's argument and concluded that Iowa Code section 554.2712 "displaced" the common law, *see* Iowa Code

§ 554.1103(2), such that a breaching seller's offer of the same goods is not "cover" as a matter of law. So, according to the court of appeals, CMT's offer had no relevance to Logan Contractors' damages remedy.

The IUCC gives an aggrieved buyer broad remedies for a seller's breach. *See* U.C.C. § 2-711 cmt. 3, 1C U.L.A. 343 (A.L.I. & Unif. L. Comm'n 2012) ("[T]his Act requires its remedies to be liberally administered . . . ."). The purpose for allowing a buyer to cover by purchasing substitute goods is to "provide[] the buyer with a remedy aimed at enabling him to obtain the goods he needs thus meeting his essential need." *Id.* § 2-712 cmt. 1, 1C U.L.A. 389. Yet, nothing in the relevant IUCC provisions requires an aggrieved buyer to give in to a breaching seller's demand for a higher price as a matter of cover. Indeed, the aggrieved buyer has no obligation to cover at all. *See* Iowa Code § 554.2712(3) ("Failure of the buyer to effect cover within this section does not bar the buyer from any other remedy."); *see also* U.C.C. § 2-712 cmt. 3, 1C U.L.A. 389 ("[C]over is not a mandatory remedy for the buyer. The buyer is always free to choose between cover and damages for non-delivery under the next section."). Thus, we agree with Logan Contractors: when an aggrieved buyer chooses to cover under section 554.2712, the buyer is not obligated to accept the breaching seller's demand for a higher price—even if that demand is the least costly alternative to the original agreement.

That said, a buyer like Logan Contractors who elects to cover has "a duty to act reasonably to mitigate its damages." *BRC Rubber & Plastics, Inc. v. Cont'l Carbon Co.*, 981 F.3d 618, 634 (7th Cir. 2020); *see also* Iowa Code § 554.2712(1) ("[T]he buyer may 'cover' by making in good faith and without unreasonable delay *any reasonable* purchase of . . . goods in substitution for those due from the seller." (emphasis added)). CMT's reliance on the Restatement goes to mitigation,

not to cover in the first instance. Mitigation is "an affirmative defense that [the breaching seller] ha[s] the burden of proving." *BRC Rubber & Plastics, Inc.*, 981 F.3d at 634; *see also UE Loc. 893/IUP*, 997 N.W.2d at 15 ("[T]he burden of pleading and proving inadequate mitigation is on 'the asserting party,' the party who breached." (quoting *R.E.T. Corp. v. Frank Paxton Co.*, 329 N.W.2d 416, 422 (Iowa 1983))). We thus address CMT's argument as one of mitigation.

**B. Restatement (Second) of Contracts Section 350 Addresses Consequential Damages, Not Cover Damages.** Principles of law and equity supplement our interpretation of the IUCC "[u]nless displaced by the particular provisions of th[e] chapter." Iowa Code § 554.1103(2). "Article 2 does not, of course, entirely eliminate the common law of contracts." *Bartlett Grain Co., LP v. Sheeder*, 829 N.W.2d 18, 23 (Iowa 2013) (quoting *Flanagan v. Consol. Nutrition, L.C.*, 627 N.W.2d 573, 578 (Iowa Ct. App. 2001)).

The IUCC does not displace the common law requirement that an aggrieved buyer must mitigate its damages. *See, e.g.*, *F.S. Credit Corp. v. Shear Elevator, Inc.*, 377 N.W.2d 227, 233 (Iowa 1985) (considering a mitigation of damages defense in a conversion case governed by the IUCC). Section 350 of the Restatement explains that, generally, "damages are not recoverable for loss that the injured party could have avoided without undue risk, burden or humiliation." Restatement (Second) of Conts. § 350(1), at 126. This is a matter of mitigation, *cf. Clinton Physical Therapy Servs., P.C. v. John Deere Health Care, Inc.*, 714 N.W.2d 603, 606 n.1 (Iowa 2006) (describing Restatement (Second) of Contracts section 350 as the basis for a failure-to-mitigate argument), so CMT's reliance on the Restatement goes to whether Logan Contractors reasonably mitigated its damages.

According to CMT, we should apply the common law principle that a breaching seller's "offer[] to perform the contract for a different price . . . may amount to a suitable alternative." Restatement (Second) of Conts. § 350 cmt. *e*, at 130. Despite the Restatement comment, CMT is hard-pressed to identify courts actually applying that principle—other than a case from 1894. *See Lawrence v. Porter*, 63 F. 62, 65–68 (6th Cir. 1894). In *Lawrence v. Porter*, when a lumber supplier refused to continue deliveries unless a mill agreed to different payment terms, the mill rejected the new terms and sought to recover damages in the form of lost profits from its planned resale of the lumber. *Id.* at 64–65. The court rejected the claim for special—i.e., consequential—damages: "The fact that they could only buy from the defendants does not affect the duty of plaintiffs to minimize their loss as far as they reasonably could. . . . The obligation on the buyer to mitigate his loss, by reason of the seller's refusal to carry out such a sale, is not relaxed because the delinquent seller affords the only opportunity for such reduction of the buyer's damage." *Id.* at 66. Thus, the buyer could not recover special damages in the form of lost profits without first mitigating its losses, even if that meant purchasing lumber from the breaching seller when it was the only available source. *Id.* at 66–68.

This general concept is carried forward into the IUCC with respect to consequential damages, which are limited to losses that "could not reasonably be prevented *by cover or otherwise*." Iowa Code § 554.2715(2)(*a*) (emphasis added); *see also* U.C.C. § 2-715 cmt. 2, 1C U.L.A. 503 (recognizing that a buyer seeking to recover consequential damages must "attempt to minimize his damages in good faith, either by cover or otherwise"). This principle does not apply here because Logan Contractors does not seek consequential damages. Nonetheless, we cannot ignore the fact that recovering consequential damages is

conditioned on the buyer's cover efforts. *See* Iowa Code § 554.2715(2)(*a*); *see also* U.C.C. § 2-712 cmt. 3, 1C U.L.A. 389 ("[S]ubsection [(3) of section 2-712, governing cover,] must be read in conjunction with the section which limits the recovery of consequential damages to such as could not have been obviated by cover.").

That an aggrieved buyer might need to purchase goods from a breaching seller to recover consequential damages in certain circumstances follows from *Lawrence,* which served as the basis for the Restatement's illustration of the principle:

> A contracts to sell to B a used machine from A's factory for $10,000. A breaks the contract by refusing to deliver the machine at that price, but offers to sell it to B for $11,000 without prejudice to B's right to damages. B refuses to buy it at that price and, since he cannot find a similar machine elsewhere, loses a profit of $25,000 that he would have made from use of the machine. B's damages do not include the loss of the $25,000 profit, but he can recover $1,000 from A.

Restatement (Second) of Conts. § 350, illus. 14, at 130. This illustration reflects that the concept of cover plays some role in the buyer's obligation to mitigate consequential damages. *Id.*; *see* Iowa Code § 554.2715(2)(*a*).

A leading treatise on the UCC identifies a handful of cases involving situations analogous to *Lawrence. See* 1 James J. White, Robert S. Summers & Robert A. Hillman, *Uniform Commercial Code* § 7:14 (6th ed.), Westlaw (database updated Dec. 2025) (discussing *Eberspaecher North America, Inc. v. Van–Rob, Inc.,* 544 F. Supp. 2d 592 (E.D. Mich. 2008); *Kelsey–Hayes Co. v. Galtaco Redlaw Castings Corp.,* 749 F. Supp. 794 (E.D. Mich. 1990); and *B. B. Walker Co. v. Ashland Chemical Co.,* 474 F. Supp. 651 (M.D. N.C. 1979)). Like *Lawrence,* those cases raise issues not present here, where the breaching seller was the sole supplier of the goods at issue and the buyer sought relief beyond cover

damages. *See Eberspaecher N. Am., Inc.*, 544 F. Supp. 2d at 601 (dissolving a temporary injunction requiring specific performance by the seller because the buyer could not show irreparable harm when it could "cover" by purchasing the goods at the seller's higher demanded price and sue for damages); *Kelsey–Hayes Co.*, 749 F. Supp. at 795 (addressing a buyer's argument that it agreed to a price hike under duress because it "would not have been able to obtain a sufficient supply of castings from alternative sources for 18–24 weeks"); *B. B. Walker Co.*, 474 F. Supp. at 655 (calculating damages where the buyer chose to cover from the breaching seller as the only available supplier to keep from closing its business).

Under these cases, the buyer's duty to mitigate damages may require it to continue to do business with the seller before it is entitled to certain types of damages or relief where the breaching seller is the only available supplier. But those issues are not present in the case before us, so we need not decide them. *See Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 348 (2022) (Roberts, C.J., concurring in the judgment) ("If it is not necessary to decide more to dispose of a case, then it is necessary *not* to decide more."). We mention them here only to note that, after considering the parties' arguments, "[w]e are not prepared to say that an injured party may never be obligated to minimize his loss by entertaining a subsequent and less favorable offer from the breaching party." *Cain v. Grosshans & Petersen, Inc.*, 413 P.2d 98, 102–03 (Kan. 1966).

This case is more like *BRC Rubber & Plastics, Inc. v. Continental Carbon Co.*, where the Seventh Circuit faced a nearly identical situation involving cover damages. *See* 981 F.3d at 633. A breaching seller offered to sell the same goods at a higher price after the buyer terminated the initial contract and filed suit based on the seller's repudiation. *Id.* In determining whether the buyer

properly covered, the court treated the breaching seller's new offer as an issue of mitigation and considered whether the buyer's "cover" from a competitor at a price higher than the seller's new proposal was unreasonable as a factual matter. *Id.* So too here, we must determine whether substantial evidence supports the district court's finding that Logan Contractors acted reasonably when it rejected CMT's unilateral price hike and instead purchased substitute goods from a ready market of alternative sellers.

**C. Substantial Evidence Supports the District Court's Finding That Logan Contractors' Purchases of Cover Goods Were Reasonable.** This brings us back to our review of the district court's finding that Logan Contractors' purchase of cover goods from other sellers was reasonable, even though it spent nearly five times more than CMT's offer. That "finding has 'the force of a special verdict' and is 'binding on us if supported by substantial evidence.' " *UE Loc. 893/IUP*, 997 N.W.2d at 15 (quoting *R.E.T. Corp.*, 329 N.W.2d at 419). CMT's argument that it was unreasonable not to accept the lowest-priced substitute misstates Logan Contractors' obligations under section 554.2712. "The test of proper cover is whether at the time and place the buyer acted in good faith and in a reasonable manner, and it is immaterial that hindsight may later prove that the method of cover used was not the cheapest or most effective." U.C.C. § 2-712 cmt. 2, 1C U.L.A. 389. A buyer's procurement of substitute goods complies with the statute so long as the buyer, at the time it covered, made "any reasonable purchase" while acting "in good faith and without unreasonable delay." Iowa Code § 554.2712(1).

We agree with the court of appeals that "substantial evidence supports the business court's conclusion that Logan Contractors acted reasonably when it contracted with other manufacturers to produce and deliver the cover materials

despite the higher cost." Even before the breach, CMT already had problems with production and delivery that led it to describe its own performance on projects with Logan Contractors in 2021 as "debacles." When Logan Contractors asked to meet with CMT to discuss its "tough year" and how to remedy the challenges it had with delivery and production, CMT responded with an ultimatum: pay more or end the relationship. Further, CMT's "offer" to make up the difference through a $1,000 rebate per order would have required Logan Contractors to work with CMT well beyond the twelve projects at issue in this case. CMT's breach—which would have been sufficient by itself—only gave Logan Contractors additional reason to lose confidence in CMT. *See* U.C.C. § 2-609 cmt. 1, 1C U.L.A. 102 ("[A] continuing sense of reliance and security that the promised performance will be forthcoming when due[] is an important feature of the bargain.").

*BRC Rubber & Plastics, Inc.* involved similar facts. The district court found that "BRC reasonably believed both that Continental's unilateral price increase would affect all future shipments of carbon black for years to come, and that Continental would withhold future shipments if BRC did not pay the price increase." *BRC Rubber & Plastics, Inc.*, 981 F.3d at 630. "In other words," the court continued, "Continental had shown BRC that it was not a trustworthy business partner and supplier for a commodity essential for BRC's business." *Id.* After considering whether BRC's cover was reasonable, the Seventh Circuit found no clear error in the district court's finding "that [the buyer] was not required to trust its fate to [the breaching seller] any longer" where the buyer "engaged in reasonable negotiations with other potential suppliers and agreed to commercially reasonable terms." *Id.* at 634. Here, not only did Logan Contractors have reason to lose faith in CMT, but it also solicited replacement bids from

multiple suppliers and purchased substitute goods at or slightly below the then-current market rate amidst global pandemic-induced supply chain issues. The district court's finding that Logan Contractors acted in a commercially reasonable manner is supported by substantial evidence. *See id.* at 630; *UE Loc. 893/IUP*, 997 N.W.2d at 15.

CMT's fallback argument—that even setting aside its own offer, Logan Contractors still did not appropriately cover—also fails. CMT contends that Logan Contractors failed to choose the least expensive option among the other alternative sellers for three of the twelve breached projects. Logan Contractors rebuts that claim as a factual matter because CMT omitted freight costs from its calculation of one supplier's bid to argue it was lower than the bid that Logan Contractors accepted. Either way, section 554.2712 does not hinge on whether cover goods were the cheapest substitute. Rather, it requires "reasonable negotiations" and "commercially reasonable terms." *BRC Rubber & Plastics, Inc.*, 981 F.3d at 634; *accord* Iowa Code § 554.2712(1) (allowing "any reasonable purchase"). Each purchase of cover goods from a different seller was at or slightly below market rate at the time, and there is no evidence that the purchases were not made in good faith and without unreasonable delay. That Logan Contractors solicited multiple bids for each project and did not always choose the same supplier is sufficient to support the district court's conclusion that the cover purchases were reasonable.

We affirm the district court's finding that Logan Contractors' cover purchases were reasonable. *See UE Loc. 893/IUP*, 997 N.W.2d at 15.

**III. Conclusion.**

We affirm the district court's judgment except for the part of the order that awarded double prejudgment interest to CMT. We remand for the district court

to incorporate the paragraph drafted by the court of appeals in its remand order concerning prejudgment interest.

**Decision of the Court of Appeals Affirmed in Part and Vacated in Part; District Court Judgment Affirmed in Part, Vacated in Part, and Case Remanded.**